**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID HURLIC; SUSANNA H.
SELESKY, individually and on
behalf of a class of all other
persons similarly situated,
            *Plaintiffs-Appellants,*

            v.

SOUTHERN CALIFORNIA GAS
COMPANY; SOUTHERN CALIFORNIA
GAS COMPANY PENSION PLAN,
            *Defendants-Appellees.*

No. 06-55599

D.C. No.
CV-05-05027-R

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
February 15, 2008—Pasadena, California

Filed August 20, 2008

Before: Betty B. Fletcher, Daniel M. Friedman,* and
N. Randy Smith, Circuit Judges.

Opinion by Judge N. Randy Smith

*The Honorable Daniel M. Friedman, Senior United States Circuit
Judge for the Federal Circuit, sitting by designation.

11089

**COUNSEL**

Jeffrey Lewis,Vincent Cheng, Lewis, Fenberg, Renaker & Jackson, P.C., Oakland, California; James M. Finberg, Steven M. Tindall, Leiff, Cabraser, Heimann & Bernstein, LLP, San Francisco, California, for the plaintiffs-appellants.

Jeffrey R. Tone, Anne E. Rea, Chris K. Meyer, Sidley Austin LLP, Chicago, Illinois; Mark E. Haddad, Michael C. Kelley, Robert M. Stone, Sidley Austin LLP, Los Angeles, California, for the defendants-appellees.

## OPINION

N. RANDY SMITH, Circuit Judge:

David Hurlic, Susanna Selesky, and others similarly situated ("Plaintiffs")[1] appeal the district court's dismissal of the entirety of their lawsuit against Southern California Gas Company ("SCGC") and the SCGC Pension Plan ("the Plan"). Plaintiffs allege that SCGC's 1998 amendment of the Plan violated both the Employee Retirement Income Security Act of 1974 (ERISA) and the California Fair Employment and Housing Act (FEHA). We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

This appeal requires our court to consider, for the first time, whether pension plans utilizing a so-called cash balance formula ("cash balance plans") violate various provisions of ERISA and FEHA. We join four of our sister circuits and hold that cash balance plans do not violate 29 U.S.C. § 1054(b)(1)(H), an anti-age discrimination provision of ERISA. We also hold that cash balance plans do not violate 29 U.S.C. § 1054(b)(1)(B), one of ERISA's "anti-backloading" provisions. We further hold that ERISA pre-empts Plaintiffs' state law FEHA claim. Thus, we affirm the district court's dismissal of those claims. However, because Plaintiffs' complaint adequately alleged that SCGC and the Plan violated ERISA's notice requirement, we hold that the district court erred by dismissing that claim.

---

[1]This case has not been certified as a class action.

## FACTUAL BACKGROUND

The Plan, an ERISA-governed pension benefit plan, provides participating SCGC employees with a defined benefit at retirement according to a benefit accrual formula set forth in the Plan. Prior to July 1, 1998, the Plan required participants' retirement benefits to be calculated according to a "pre-conversion formula." Under the pre-conversion formula, participants were entitled to a single-life annuity, payable monthly, beginning at normal retirement age. The amount of the annuity was based on participants' average compensation during the final years of their employment with SCGC, which was then multiplied by a percentage that increased with years of service.

Effective July 1, 1998, SCGC amended the Plan. As a result of the amendment, non-union employees' benefits are now calculated under a "cash balance formula." The cash balance formula assigns each participant a "retirement account." Each retirement account is merely a bookkeeping entry used to calculate a participant's accrued benefit. The account exists on paper but is hypothetical in the sense that no real money is ever deposited into individual accounts.

The initial balance of each participant's retirement account is the actuarial equivalent of the participant's accrued benefit under the Plan prior to the July 1, 1998 amendment. Thereafter, the cash balance formula credits, on a monthly basis, each participant's retirement account with "retirement credits." The annual total of a participant's retirement credits equals 7.5 percent of his or her annual earnings. The cash balance formula also credits each participant's retirement account with interest credits, which are based on the 30-year U.S. Treasury Bond rate. A participant's retirement account continues to accrue interest credits until normal retirement age regardless of whether the participant continues to work for SCGC.

Like the pre-conversion formula, a participant's benefit under the cash balance formula is paid in the form of a single-

life annuity beginning at normal retirement age. The amount of a participant's annuity is based on the actuarial equivalent of the participant's retirement account balance at normal retirement age. However, unlike the pre-conversion formula, the cash balance formula allows participants to elect to receive their accrued benefits in a single lump sum payment.

The Plan, as amended, also contained a five-year "grandfather" provision. The grandfather provision allowed eligible participants to continue accruing benefits under the pre-conversion formula until June 30, 2003, at which time the participants' accrued benefits under the pre-conversion formula were frozen. During this five-year period, each participant's retirement account was also credited as normal under the cash balance formula. A participant who began to receive benefit distributions during this period was entitled to receive the greater of: 1) the actuarial equivalent of the Retirement Account under the terms of the Cash Balance Plan expressed in the form of an annuity; or 2) an annuity accrued under the Pre-Conversion Formula through the individual's termination date.

If a participant did not begin receiving a payout of benefits on or before June 30, 2003, the amount of his or her accrued benefit is determined by a "wear-away provision." The wear-away provision provides that a participant's accrued benefit is an age 65 single-life annuity equal to the greater of: 1) the actuarial equivalent of his or her retirement account under the cash balance formula; or 2) the actuarial equivalent of his or her frozen accrued benefit under the pre-conversion formula.

Hurlic, who is 53 years old, has been an SCGC employee since 1983 and is a Plan participant. Selesky, who is 56 years old, has been an SCGC employee since 1977 and is also a Plan participant. Both Hurlic and Selesky were eligible under the Plan's grandfather provision and continued accruing benefits under the pre-conversion Formula until June 30, 2003. Under the wear-away provision, Hurlic's estimated annuity

payments based on his frozen pre-conversion formula benefits will be greater than his estimated annuity payments based on the cash balance formula until 2015. Selesky's estimated annuity payments based on her frozen pre-conversion formula benefits will be greater until 2009. Thus, Hurlic and Selesky will not accrue any additional benefits during these periods.

On July 8, 2005, Hurlic and Selesky filed suit against SCGC and the Plan on behalf of all similarly situated individuals. Plaintiffs alleged that: 1) the Plan, as amended, discriminates on the basis of age in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H); 2) the Plan, as amended, violates ERISA's "anti-backloading" rules; 3) the adoption and implementation of the wear-away provision of the Plan amendment disproportionately affected SCGC employees age 40 and older in violation of FEHA; and 4) the Plan violated ERISA's requirement that a pension plan may not be amended as to cause a significant reduction in the rate of benefit accrual unless advance notice of the effective date is provided (the "notice claim").

On October 18, 2005, the district court, without opinion, dismissed without leave to amend Plaintiffs' age discrimination, anti-backloading, and FEHA claims for failure to state a claim. The district court also dismissed Plaintiffs' notice claim for failure to state a claim, but granted Plaintiffs ten days to amend their complaint. On October 25, 2005, Plaintiffs filed their first amended complaint.

On January 25, 2006, the district court dismissed Plaintiffs' amended notice claim for failure to state a claim and again gave Plaintiffs ten days to further amend their complaint. After Plaintiffs filed a second amended complaint, the district court dismissed Plaintiffs' notice claim for a third time, this time without leave to amend. All three dismissal orders were adopted as proposed by Defendants and did not include any explanation of the basis for the decision.

## STANDARD OF REVIEW

We review de novo a district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1120 (9th Cir. 2007). "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff. Dismissal of the complaint is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Id*. (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1261 (9th Cir. 2004)).

## ANALYSIS

### I. Cash balance plans do not violate ERISA § 204(b)(1)(H)

We must decide for the first time whether cash balance pension plans discriminate based on age in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H). We join the Second, Third, Sixth, and Seventh Circuits and hold that they do not. *See Hirt v. Equitable Ret. Plan for Employees, Managers and Agents*, ___ F.3d ___, 2008 WL 2669346 (2d Cir. July 9, 2008); *Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56 (3d Cir. 2007); *Drutis v. Rand McNally & Co.*, 499 F.3d 608 (6th Cir. 2007); *Cooper v. IBM Personal Pension Plan*, 457 F.3d 636 (7th Cir. 2006).

#### A. Cash balance plans are defined benefit plans

**[1]** ERISA provides for two types of pension plans — defined contribution plans and defined benefit plans — each governed by different rules. A defined contribution plan "provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account." 29 U.S.C. § 1002(34). Typically, in a defined contribution plan, the employer contributes a percent-

age of payroll or profits to participants' accounts and, at retirement, a participant is entitled to whatever assets are dedicated to his or her individual account, subject to investment gains and losses. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999); *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 154 (1993). A defined benefit plan is any qualified pension plan that is not a defined contribution plan. 29 U.S.C. § 1002(35). A defined benefit plan "promises to pay employees, upon retirement, a fixed benefit under a formula." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 637 n.1 (1990). A defined benefit plan "consists of a general pool of assets rather than individual dedicated accounts." *Hughes Aircraft*, 525 U.S. at 439. The asset pool may be funded by the employer, employee, or both, but "the employer typically bears the entire investment risk and . . . must cover any underfunding" that might occur as a result of the plan's investments. *Id.*

[2] We recognize, and the parties agree, that despite superficial resemblance to defined contribution plans, cash balance plans, including the Plan at issue here, are defined benefit plans. *See, e.g.*, *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 757 (7th Cir. 2003); *Campbell v. Bank-Boston, N.A.*, 327 F.3d 1, 4 (1st Cir. 2003); *Esden v. Bank of Boston*, 229 F.3d 154, 158 (2d Cir. 2000); *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1237 (11th Cir. 2000) (all holding that cash balance plans are defined benefit plans). Cash balance plans guarantee participants a defined benefit, determined by a formula, at retirement. The participants bear no risk that their accrued benefits will decrease due to investment risk. Additionally, unlike defined contribution plans, the "contributions" made to individual accounts under cash balance plans merely reflect bookkeeping entries that track the growth of the participants' accrued benefits. Accordingly, cash balance plans must comply with ERISA rules governing defined benefit plans.

### B. Cash balance plans do not reduce the rate of an employee's benefit accrual because of the attainment of any age

[3] ERISA § 204(b)(1)(H)(i) prohibits a defined benefit plan from ceasing an employee's benefit accrual or reducing "the rate of an employee's benefit accrual . . . because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H)(i). Plaintiffs argue that the Plan violates this provision because it guarantees interest credits regardless of continued employment with SCGC. Thus, a younger participant who performs the same job and earns the same salary as an older participant will always have a greater accrued benefit at retirement age.[2]

Plaintiffs' argument equates the phrase "rate of an employee's benefit accrual," as used in ERISA § 204(b)(1)(H)(i), with the term "accrued benefit," which is defined elsewhere in ERISA. For defined benefit plans, ERISA defines a participant's "accrued benefit" as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). Thus, Plaintiffs argue that ERISA § 204(b)(1)(H)(i) prohibits a plan from reducing a participant's *total accrued benefit* because of the "attainment of any age" rather than prohibiting only a reduction in the rate at which the participant's benefit accrues. We reject this argument for several reasons.

---

[2]For example, consider the case of an 18 year-old employee and a 48 year-old employee who both perform the same job duties and earn the same salary. Both work for SCGC for two years and then leave for other jobs when they are 20 years old and 50 years old, respectively. Under the Plan, both would have the same accrued benefit at the end of those two years. However, assuming neither employee took an early lump-sum distribution, the 20 year-old would continue to compound interest for 45 years (until age 65), while the 50 year-old would compound interest for only 15 years.

**[4]** First, it is a basic principle of statutory construction that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Congress defined the term "accrued benefit" in ERISA and used it throughout ERISA § 204(b)(1). However, Congress omitted the term "accrued benefit" in ERISA § 204(b)(1)(H)(i) and replaced it with the phrase "rate of an employee's benefit accrual." 29 U.S.C. § 1054(b)(1)(H)(i). Thus, we must presume that Congress intended to do so. The phrase "rate of an employee's benefit accrual" plainly refers to the rate at which a participant's benefits increase rather than the participant's total accrued benefit. Interpreting ERISA § 204(b)(1)(H)(i) in another context, the Supreme Court has held likewise. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 897 (1996) ("A reduction in total benefits due is not the same thing as a reduction in the rate of benefit accrual; the former is the final outcome of the calculation, whereas the latter is one of the factors in the equation.").

Plaintiffs' argument also equates the phrase "rate of an employee's benefit accrual" with the defined term "accrued benefit," because Congress used the words "benefit accrual" in ERISA's anti-age discrimination provision which pertains to defined benefit plans, but did not use those words in the anti-age discrimination provision which pertains to defined contribution plans. *Compare* 29 U.S.C. § 1054(b)(1)(H)(i) *with* 29 U.S.C. § 1054(b)(2)(A). Defined contribution plans satisfy ERISA's anti-age discrimination provision as long as "allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(2)(A). Plaintiffs do not, and could not, dispute the fact that the Plan would be non-discriminatory if it was a defined contribution plan. However, given that defined benefit plans and defined contribution plans are often gov-

erned by different rules, Plaintiffs argue that something which is non-discriminatory for a defined contribution plan must be discriminatory for a defined benefit plan, merely because Congress chose to word the rule for defined benefit plans to describe prohibited conduct while wording the rule for defined contribution plans to describe permissible conduct.

This argument, however, ignores that defined benefit plans are not always governed by different rules than are defined contribution plans. The 1986 conference notes regarding ERISA's anti-age discrimination provisions strongly suggest that Congress did not intend that different age discrimination rules should apply for defined benefit plans and defined contribution plans. *See* H.R. Rep. No. 99-1012, at 378 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 3868, 4023 (explaining that "benefit accruals or continued allocations to an employee's account under either a defined benefit plan or a defined contribution plan may not be reduced or discontinued on account of the attainment of a specified age"). Additionally, both anti-age discrimination provisions explicitly reference the "rate" at which employee's benefits accrue. Thus, nothing demonstrates that Congress intended a formula that "is non-discriminatory when used in a defined-contribution plan" to "become unlawful because the account balances are book entries rather than cash." *Cooper*, 457 F.3d at 638.

Second, we agree with the Seventh Circuit that nothing suggests that "Congress set out to legislate against the fact that younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings." *Cooper*, 457 F.3d at 639. Plaintiffs' argument ignores the realities of the time value of money. Under a cash balance plan, younger workers have more years in which to earn interest, but must wait longer until their benefit is paid out. However, if a participant elects to receive a payout before reaching age 65, the Plan must distribute the "actuarial equivalent" of the annuity that would be

available at normal retirement age. *Id.* at 640 (citing 29 U.S.C. § 1054(c)(3)). This value is calculated by adding all the interest that the participant would accrue through age 65 and discounting the resulting sum to its present value. *Id.*

Time value of money can be best illustrated using the example in footnote 2, above. Assume that in 15 years, when the older worker has reached retirement age, the younger worker decides to withdraw his benefits from the Plan. The amount the younger worker receives will be calculated by adding up all of the interest he would have earned had he waited until he was 65 to retire and discounting it to present value. Depending on the factor used to discount to present value, he will receive substantially similar (or possibly less) benefit than the older worker. Thus, although a younger worker's total accrued benefit at retirement age will be greater under the cash balance formula than an older worker's if both started working at the same time, the difference is due to the time value of money rather than age discrimination. *See id.* at 639 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) (holding that variables correlated with age must be kept "analytically distinct" from age when searching for discrimination)).

Finally, Plaintiffs' argument would require us to ignore Congress's use of the word "attainment" in ERISA § 204(b)(1)(H)(i). The phrase "attainment of any age" means the act of reaching a certain age. *See* Webster's Third New International Dictionary 140 (1993). The Plan's cash balance formula does not reduce an older worker's accrued benefit when he or she *attains* a certain age. Rather, the Plan sets a lower ceiling for an older worker's accrued benefit because he or she has less time to earn interest than a similarly situated younger worker.

The statute's legislative history makes clear that the word "attainment" is important. As originally enacted, ERISA did not require that a pension plan allow participants who worked

beyond normal retirement age to continue earning benefits. *See* H.R. Rep. No. 99-1012, at 378 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 3868, 4023. In 1986, Congress enacted provisions to remedy that problem, explaining that "benefit accruals or continued allocations to an employee's account under either a defined benefit plan or a defined contribution plan may not be reduced or discontinued on account of the attainment of a *specified* age." *Id.* (emphasis added).

This language clearly describes Congress's intent to prohibit pension plans from reducing or ceasing benefits when a participant reached age 65 or any other specified age. For example, the Plan would clearly be in violation of ERISA § 204(b)(1)(H)(i) if it provided that when participants reached age 50, they stopped receiving benefits or began accruing benefits at a reduced rate. However, the Plan does no such thing. It is not within our province "to read out of the statute the requirement of its words." *Quarty v. United States*, 170 F.3d 961, 973 (9th Cir. 1999) (citing *Rand v. United States*, 249 U.S. 503, 510 (1919)).

Plaintiffs' reading of the statute would allow every worker who does not begin employment with SCGC at the minimum employment age to bring an age discrimination claim.[3] Alternatively, it would force all employers to scale interest rates in

---

[3]Under Plaintiffs' logic, a 19 year-old participant would have a viable claim for age discrimination because when he or she attained age 19, his or her total accrued benefits are reduced in comparison with a similarly situated 18 year-old participant. This argument makes little sense. Neither the rate of benefit accrual nor the total accrued benefit of the 19 year-old are actually *reduced* when he or she *attains* age 19. At that time, the 19 year-old's rate of benefit accrual and total accrued benefit are equal to the 18 year-old's. In fact, assuming that their salaries remain equal, both will have the same rate of benefit accrual and total accrued benefit until the 19 year-old turns 65 and begins receiving a payout of benefits. The 18 year-old's total accrued benefit will, over the course of the following year, become larger because he or she will have to wait one more year to receive benefits and interest will compound during that year.

a way that made the total benefit accrued equal for all employees regardless of time remaining until retirement. For example, Plaintiffs seem to believe that a 64 year-old participant should earn as much interest in one year as an 18 year-old does in 47 years. This reading of the statute completely ignores the time value of money. Thus, not only does Plaintiffs' interpretation of ERISA § 204(b)(1)(H)(i) read out important words, it would also lead to absurd results. *See Arizona State Bd. for Charter Sch. v. U.S. Dept. of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) (noting that "well-accepted rules of statutory construction caution us that 'statutory interpretations which would produce absurd results are to be avoided' " (citation omitted)).

**[5]** Under the Plan, a younger participant and older participant earning the same salary will both receive the same retirement credit and interest credit to their bookkeeping account every year. Thus, their benefits will accrue at an equal rate. The only difference is that, based on the time value of money, a younger participant's total accrued benefit at retirement will be greater because the younger participant has more time before retirement in which interest will compound. Because the Plan does not reduce a participant's rate of benefit accrual due to the attainment of any age, the Plan does not violate ERISA § 204(b)(1)(H)(i). Plaintiffs cannot prove any set of facts on which they would be entitled to relief. Thus, the district court correctly dismissed Plaintiffs' claim. *See Stoner*, 502 F.3d at 1120.

## II. Cash balance plans do not violate 29 U.S.C. § 1054(b)(1)(B)

**[6]** Plaintiffs also argue that the district court erred by dismissing their claim that the Plan violates ERISA's "anti-backloading" provisions. ERISA includes three "anti-backloading" provisions: the three percent rule, the 133-1/3 percent rule, and the fractional rule. 29 U.S.C. § 1054(b)(1)(A)-(C). All three are intended to prevent plans

from "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and . . . concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement." H.R. Rep. No. 93-807 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4670, 4688. A plan need only comply with one of the "anti-backloading" provisions. 29 U.S.C. § 1054(b)(1)(A)-(C).

Plaintiffs argue that the Plan violates the 133-1/3 percent rule, which provides that benefits accrued in any one year may not exceed 133-1/3 percent of the benefit accrued in any prior year.[4] 29 U.S.C. § 1054(b)(1)(B). Plaintiffs argue that they will not accrue any additional benefits until the year in which their cash balance formula benefits exceed their frozen pre-conversion formula benefits. Thus, during the wear-away period, Plaintiffs contend that they will accrue benefits at a rate of zero percent. According to Plaintiffs' theory, the benefits they accrue in the year in which their cash balance formula benefits become greater than their frozen pre-conversion formula benefits will thus, by definition, exceed 133-1/3 percent of the benefits they accrued during the wear-away period.

Plaintiffs' argument is premised on the idea that Treasury Regulation section 1.411(b)-1(a) requires that we use two different formulas when applying the 133-1/3 percent rule: the pre-conversion formula while their frozen benefits are greater and the cash balance formula once their cash balance account exceeds their frozen benefits. Treasury Regulation section 1.411(b)-1(a) states:

---

[4]Plaintiffs assert that the Plan violates ERISA if it does not comply with the 133-1/3 percent rule because the other two anti-backloading provisions do not apply to cash balance plans. Although SCGC and the Plan challenge this assertion, we need not address either the three percent rule or the fractional rule because we hold that the Plan satisfies the 133-1/3 percent rule.

> A defined benefit plan may provide that accrued benefits for participants are determined under more than one plan formula. In such a case, the accrued benefits under all such formulas must be aggregated in order to determine whether or not the accrued benefits under the plan for participants satisfy one of the alternative methods.

26 C.F.R. § 1.411(b)-1(a)(1).[5]

In *Register*, the Third Circuit addressed this argument and held that a similar plan did not violate the 133-1/3 percent rule. 477 F.3d at 70-72. The *Register* court reasoned that because of the "plan amendment provision" to the 133-1/3 percent rule, the plan did not, in fact, determine participants' benefits under more than one formula. *Id.* at 72. The "plan amendment provision" to the 133-1/3 percent rule provides that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." 29 U.S.C. § 1054(b)(1)(B)(i). "Thus, once there is an amendment to the prior plan, only the new plan formula is relevant when ascertaining if the plan satisfies the [133-1/3 percent rule]." *Register*, 477 F.3d at 72.

As in *Register*, if the Plan's cash balance formula had been in effect for all other Plan years, Plaintiffs "never would have accrued a benefit under the old plan and would have started to accrue benefits under the cash balance formula from the beginning of their employment." *Id.* Plaintiffs would always have had an annual accrual rate equal to 7.5 percent of their salary plus their interest credit. Thus, the Plan would not violate the 133-1/3 percent rule.

But the Plan differs from the pension plan at issue in *Regis-*

---

[5]Although the Treasury Regulation was adopted under the Internal Revenue Code § 411, 26 U.S.C. § 411, it applies equally to the parallel requirements of 29 U.S.C. § 1054. *See* 29 U.S.C. § 1202(c).

*ter* in that, after SCGC amended the Plan, the Plan's grandfather provision allowed employees pre-conversion benefits to increase for five years before they were frozen. The pension plan in *Register* froze employees' pre-conversion benefits as of the date of amendment. *Id*. at 60. However, this distinction does not change the result. To the extent that the Internal Revenue Service's ("IRS") Revenue Ruling 2008-7 suggests otherwise, we find its reasoning unpersuasive and decline to defer to the IRS's interpretation of the 133-1/3 percent rule. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (holding that the weight afforded to an administrative agency's interpretation of a statute contained in an informal rulemaking depends on "all those factors which give it power to persuade," including "the validity of its reasoning"); *Omohundro v. United States*, 300 F.3d 1065, 1067-68 (9th Cir. 2002) (applying *Skidmore* deference to a Revenue Ruling); *see generally McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1112 (9th Cir. 2000) ("Though revenue rulings do not have the force of law, they do constitute a body of experience and informed judgment to which we may look for guidance.").

In Revenue Ruling 2008-7, the IRS applied provisions of the Internal Revenue Code which parallel ERISA's "anti-backloading" provisions to a pension plan which had converted to a cash balance formula. Rev. Rul. 08-7, 2008-7 I.R.B. 419. The IRS recognized that, due to the "plan amendment provision" of the 133-1/3 percent rule, such plans do not violate the 133-1/3 percent rule if, like in *Register*, a participant's pre-conversion benefits are frozen as of the date of the plan amendment. *Id*. However, the IRS indicated that a plan would violate the 133-1/3 percent rule if it allowed participants to continue to accrue benefits under a pre-conversion formula for a period of time before they became frozen. The IRS's discussion of this issue provided little in the way of reasoning. The IRS relied heavily on an example which seems to suggest that the IRS believes that the aggregation rule of Treasury Regulation section 1.411(b)-1(a) trumps the "plan amendment provision" and requires aggregation of the two

formulas whenever a plan contains a grandfather provision like the one at issue here.[6]

[7] We disagree. The fact that the Plan allowed eligible participants' pre-conversion formula benefits to accrue until June 30, 2003 before becoming frozen rather than simply freezing them on July 1, 1998 (when SCGC amended the Plan) does not implicate Treasury Regulation section 1.411(b)-1(a). Quite simply, the Plan, as amended, does not determine a participant's benefits by aggregating two formulas. The sections of the Plan entitled "Reservation of Prior Plan Accrued Benefit" and "Grandfather Benefit Amount" both refer to a participant's accrued benefit under the "Prior Plan." Because Congress has directed us to treat the amended plan as if it was in effect for all other plan years, 29 U.S.C. § 1054(b)(1)(B)(i), we must assume that, for purposes of applying the 133-1/3 percent rule, there was never a prior plan under which Plaintiffs accrued benefits.

This analysis does not change merely because SCGC included a beneficial grandfather provision in the Plan rather than simply freezing all participants' pre-conversion benefits on July 1, 1998, as it clearly could have. The only difference is that SCGC allowed eligible participants' pre-conversion formula benefits to increase before they were frozen. It would be an odd result indeed to allow a pension plan which converts to a cash balance formula to freeze pre-conversion benefits immediately but forbid a plan from providing for a grace period in which participants can continue to accrue additional benefits before they are frozen.[7]

---

[6]The IRS does, however, ultimately conclude that a plan such as the one at issue here may not violate ERISA's "anti-backloading" provisions provided that the plan can show that it satisfies the fractional rule for each participant. Rev. Rul. 08-7, 2008-7 I.R.B. 419.

[7]Our conclusion is further supported by the Treasury Department's proposed amendments to the regulation which would clarify that "a plan that determines a participant's accrued benefit as the greatest of the benefits

**[8]** Additionally, we note that neither the Plan's conversion to the cash balance formula nor its grandfather provision conflict with the objective of ERISA's "anti-backloading" provisions, which is "to prevent a plan from being unfairly weighted against shorter-term employees." *Register*, 477 F.3d at 72 (internal quotation marks omitted). Because the Plan satisfies the 133-1/3 percent rule, Plaintiffs can prove no set of facts on which they would be entitled to relief on their claim that the Plan violates ERISA's "anti-backloading" provisions. Accordingly, the district court correctly dismissed this claim. *See Stoner*, 502 F.3d at 1120.

## III.  ERISA preempts Plaintiffs' FEHA claim

**[9]** SCGC argues that ERISA preempts Plaintiffs' state law FEHA claim for age discrimination. ERISA § 514(a) contains a broad preemption provision stating that ERISA:

> shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title

29 U.S.C. § 1144(a). Plaintiffs concede that their FEHA claim "relates" to an employee benefit plan and thus falls within ERISA's general preemption provision. Nevertheless, Plaintiffs argue that their FEHA claim is saved from preemption by ERISA § 514(d), which provides that ERISA's general preemption provision shall not "be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." 29 U.S.C. § 1144(d). Specifically, Plaintiffs argue

---

determined under two or more separate formulas is permitted . . . to demonstrate satisfaction [of the anti-backloading rule] by demonstrating that each separate formula satisfies" the anti-backloading requirement. 73 Fed. Reg. 34665, 34669 (June 18, 2008). Thus, under the amended regulations, aggregation will not be required in cases such as this one.

that the joint state/federal enforcement scheme of the Age Discrimination in Employment Act ("ADEA") would be impaired if we were to hold that ERISA preempts their FEHA claim.

In *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 101-06 (1983), the Supreme Court addressed whether ERISA § 514(d) saved from preemption a state anti-discrimination law which "relate[d] to an employee benefit plan" under ERISA § 514(a). Specifically, the Court considered the appellants' argument that preemption of the state law would impair the joint state/federal enforcement scheme of Title VII. *Id.*

**[10]** The Court recognized that Title VII provides for a comprehensive joint state/federal enforcement scheme wherein both states and the federal government enact valid anti-discrimination laws and work together to enforce them. *Id.* at 101-02. Given this interplay, the Court held that preemption of a state anti-discrimination law would "impair Title VII to the extent that the [state law] provides a means of enforcing Title VII's commands." *Id.* at 102. Thus, the Court held that, as long as the state anti-discrimination law does not prohibit something that Title VII allows, preempting the state law would "frustrate the goal of encouraging joint state/ federal enforcement of Title VII" and thus "impair" federal law. *Id.* In so holding, the Court expressed concern that, if ERISA were interpreted to entirely preempt state anti-discrimination laws as they relate to employee benefit plans, states would be unable to prohibit or grant relief for discrimination in ERISA plans and thus "an employee's only remedies for discrimination prohibited by Title VII in ERISA plans would be federal ones." *Id.*

**[11]** The Court also noted that Title VII "does not itself prevent States from extending their nondiscrimination laws to areas not covered by Title VII." *Id.* However, enforcement of Title VII does not depend on such extensions of state law. "Title VII would prohibit precisely the same employment

practices, and be enforced in precisely the same manner, even if no State made additional employment practices unlawful." *Id.* Thus, the Court held that "[i]nsofar as state laws prohibit employment practices that are lawful under Title VII, . . . preemption would not impair Title VII within the meaning of § 514(d)." *Id.* at 103.

**[12]** The ADEA provides for a joint state/federal enforcement scheme that is nearly identical to that provided in Title VII. *Compare* 29 U.S.C. § 633(b) *with* 42 U.S.C. § 2000e-5(c). However, FEHA does not merely parallel the ADEA, as Plaintiffs allege. It is true that both statutes contain broad prohibitions against age discrimination. *Compare* 29 U.S.C. § 623(a) *with* Cal. Gov't Code §§ 12940, 12941. But unlike FEHA, the ADEA contains specific provisions relating to pension plans. *See* 29 U.S.C. § 623(i). One of these, ADEA § 4(i)(1)(A), mirrors ERISA § 204(b)(1)(H)(i), the section which forms the basis for Plaintiffs' first claim. Those two provisions were enacted together as part of the 1986 Omnibus Budget Reconciliation Act, 99 Pub. L. 509, 100 Stat. 1874, and Congress has made clear that the provisions should be interpreted to have an identical meaning. H.R. Rep. No. 99-1012, at 378-79 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 3868, 4023-24. Because we have held that the Plan does not violate ERISA § 204(b)(1)(H)(i), it follows that the Plan does not violate ADEA § 4(i)(1)(A).

Plaintiffs argue, however, that ADEA § 4(i) does not exclusively govern age discrimination claims relating to pension plans, and that their FEHA claim tracks ADEA § 4(a), not ADEA § 4(i)(1)(A). In support of their position, they point out that their first and fourth claims are not identical. Specifically, the first claim asserts that the cash balance formula as a whole discriminates on the basis of age, while the fourth claim challenges only the wear-away provision of the amended Plan, under which many workers suffer a temporary cessation of benefit accrual.

Although it is true that the two claims are not identical, the difference between them does not save the FEHA claim from preemption. The controlling provision in this case is ADEA § 4(i)(4), which provides that "[c]ompliance with the requirements of [subsection (i)] with respect to an employee benefit pension plan shall constitute compliance with the requirements of [ADEA § 4] relating to benefit accrual under [an employee pension benefit] plan."[8] 29 U.S.C. § 623(i)(4). Thus, we must determine whether the wear-away provision of the Plan relates to benefit accrual. If it does, the wear-away provision need satisfy only the requirements of ADEA § 4(i). *See id.*

The term "accrue" means "to increase." Webster's Third New International Dictionary 13 (1993). "Benefit accrual" thus refers to the process by which benefits increase. *See id.* In traditional defined benefit plans, such as SCGC's pre-conversion plan, benefits increased according to a formula that took into account the employee's salary and years of service. Under the cash balance plan, benefits increase as the employer credits the account with earnings and interest credits. Plaintiffs' wear-away claim protests the fact that under the "greater of" provision, actual benefits payable (as compared to the hypothetical account balance) do not increase until the amount payable under the cash balance formula exceeds that payable under the pre-conversion formula. This claim thus relates to benefit accrual because it challenges the fact that benefits do not increase for some period of time.

---

[8]Prior to oral argument, Defendants' submissions to this court only referenced ADEA § 4(i) once, in the "Counterstatement of the Case" in their response brief. There they noted only that ERISA § 204(b)(1)(H) and ADEA § 4(i) are "parallel age discrimination provisions" that Congress indicated should be interpreted to have identical meaning. At no point did they discuss ADEA § 4(i)(4) or the relationship between subsections (a) and (i). However, we decline to conclude that this argument is waived because it presents a pure question of law and the Plaintiffs fully briefed it in their supplemental brief to the court following oral argument.

As such, it must be brought under ADEA § 4(i), not the generic anti-discrimination provision of ADEA § 4(a). However, the wear-away claim is not cognizable under ADEA § 4(i) because that subsection provides that, with respect to benefit accrual under a pension plan, a plan only engages in prohibited discrimination if it violates § 4(i)(1)(A). *See* 29 U.S.C. § 623(i)(4); *see also* H.R. Rep. No. 99-1012, at 382 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 3868, 4027 ("It is the intention of the conferees . . . that the requirements contained in section 4(i) related to an employee's rights to benefit accruals with respect to an employee benefit plan . . . shall constitute the entire extent to which ADEA affects such benefit accrual."). It follows that the wear-away provision is not prohibited by ADEA § 4.

**[13]** FEHA mirrors ADEA § 4(a), not ADEA § 4(i). Plaintiffs thus seek to invalidate the wear-away provision under a broad, general anti-age discrimination provision — something they would not be allowed to do under the ADEA. With regard to ERISA plans then, FEHA does not provide a means of enforcing the ADEA's commands such that preemption would "impair" the joint state/federal enforcement scheme of the ADEA. *See Shaw*, 463, U.S. at 102. Because FEHA prohibits practices which would be lawful under the ADEA, Plaintiffs' FEHA claim is preempted. *See* 29 U.S.C. § 1144(a); *Shaw*, 463 U.S. at 103. Thus, the district court correctly dismissed this claim.

## IV. Plaintiffs adequately stated a claim that SCGC violated ERISA's notice requirement

**[14]** At the time SCGC amended the Plan, ERISA contained a notice requirement regarding pension plan amendments which provided that:

> A plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amend-

ment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to . . . each participant in the plan[.]

29 U.S.C. § 1054(h)(1)(A) (1998) (current version at 29 U.S.C. § 1054(h)). Plaintiffs' complaint alleged that SCGC failed to provide the required notice. SCGC does not contest Plaintiffs' allegation that they did not receive notice fifteen days before the Plan amendment became effective. Rather, SCGC argues that Plaintiffs failed to adequately allege that they suffered harm.

In *Frommert v. Conkright*, the Second Circuit addressed how a plaintiff might suffer harm due to lack of notice under 29 U.S.C. § 1054(h)(1)(A). 433 F.3d 254, 266 (2d Cir. 2006). In *Frommert*, the court held that by not receiving the required notice under 29 U.S.C. § 1054(h)(1)(A), the plaintiffs "were deprived of the opportunity to take timely action in response to the purported [plan] amendment." *Id.* (internal quotation marks omitted). "Such action might have included seeking injunctive relief, altering their retirement investment strategies, or perhaps considering other employment." *Id.*

Plaintiffs' complaint alleges that the lack of notice precluded them from: 1) timely filing for injunctive relief; and 2) pursuing alternative retirement strategies. SCGC is correct to the extent that it argues that there was no potential violation of law which Plaintiffs could have enjoined even if they had received timely notice. We have held that the amended Plan does not violate ERISA's anti-age discrimination or "anti-backloading" provisions and that ERISA preempts Plaintiffs' FEHA claim.[9]

---

[9]Even if Plaintiffs had asserted a timely ADEA claim, they could not have obtained an injunction. As discussed above, the ADEA mirrors ERISA as it pertains to age discrimination relating to benefit accrual.

Although they would not have been entitled to injunctive relief if SCGC had provided notice, Plaintiffs also alleged that they could have altered their retirement strategies if SCGC had provided the required notice. SCGC insists that this allegation is insufficient as a matter of law because plaintiffs were not entitled to receive notice of "the fact or potential impact" of the wear-away provision and because the participants received a summary plan description in 2000, three years before Plaintiffs' pre-conversion benefits were frozen and the wear-away provision took effect. Both of these arguments disregard the statutory and regulatory notice requirements, however, and as a result, neither of them undermines Plaintiffs' claim.

[15] Prior to 2002, notice under 29 U.S.C. § 1054(h)(1)(A) did not "need [to] explain how the individual benefit of each participant . . . [would] be affected by the [plan] amendment." 26 C.F.R. § 1.411(d)-6T, Q&A(10) (1998). But although no such individualized explanation was required, the notice was required to provide a summary of the amendments "written in a manner calculated to be understood by the average plan participant." *Id.* Thus, contrary to SCGC's contention, Plaintiffs were entitled to receive notice of the wear-away provision. Even without an individualized explanation of how the provision would affect their benefits, notice of the provision could have induced Plaintiffs to increase savings in other retirement vehicles or to consider other employment.[10] *See Frommert*, 433 F.3d at 266.

[16] Turning to SCGC's next argument, the fact that SCGC distributed a summary plan description in 2000 does not undermine Plaintiffs' claim. The statute clearly required that notice be provided fifteen days prior to the effective date of

_____

[10]As a defined benefit plan, the Plan has always been funded exclusively by SCGC, without contributions from participants. Thus, even if Plaintiffs had received proper notice, they could not have increased retirement savings in the Plan itself.

the amendment. 29 U.S.C. § 1054(h)(1)(A) (1998); *see also Prod. & Maint. Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1404 (7th Cir. 1992) ("Section 204(h)'s language is . . . clear and imperative: a plan 'may not be amended' absent proper notice."). Even if the district court were to determine that Plaintiffs received proper notice in 2000, this tardy notice would not be sufficient to satisfy the statutory requirement, which required notice no later than June 15, 1998. There was still some period between the amendment and when notice was received during which Plaintiffs were harmed because they did not know that they should be increasing their retirement savings to cover for the decreased benefits that they would earn under the amended Plan. Allowing the Plan to provide notice of a reduction in the rate of benefit accrual two years after the fact would "upend" the purpose of 29 U.S.C. § 1054(h)(1)(A), which is to provide notice as a prerequisite to amending a plan. *See Frommert*, 433 F.3d at 266.

**[17]** Taking all allegations of material fact as true and construing them in the light most favorable to the plaintiff, we cannot say beyond doubt that Plaintiffs cannot prove any set of facts that would entitle them to relief under 29 U.S.C. § 1054(h). *See Stoner*, 502 F.3d at 1120. Thus, the district court erred by dismissing this claim.

## CONCLUSION

In conclusion, we hold that cash balance plans do not violate: 1) 29 U.S.C. § 1054(b)(1)(H), an anti-age discrimination provision of ERISA; or 2) 29 U.S.C. § 1054(b)(1)(B), one of ERISA's "anti-backloading" provisions. We also hold that ERISA preempts Plaintiffs' state law FEHA claim. Thus, we affirm the district court's dismissal of those claims. However, we hold that Plaintiffs' complaint adequately alleged that SCGC and the Plan violated ERISA's notice requirement. Thus, we reverse the district court's dismissal of Plaintiffs' notice claim and remand so that claim may be reinstated.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Each party shall bear its own costs on appeal.