FILED
United States Court of Appeals
Tenth Circuit

September 7, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WADE JENSEN; DONALD D. GOFF,
individually and on behalf of all others
similarly situated,

         Plaintiffs - Appellants,

    v.

SOLVAY CHEMICALS, INC.;
SOLVAY AMERICA, INC.; SOLVAY
AMERICA COMPANIES PENSION
PLAN,

         Defendants - Appellees.

No. 09-8082

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 2:06-CV-00273-ABJ)**

---

Stephen R. Bruce, Stephen R. Bruce Law Offices, Washington, D.C., (Allison C.
Pienta, Stephen R. Bruce Law Offices, and Richard Honaker, Honaker Law
Offices, LC, Rock Springs, Wyoming, with him on the brief), for Plaintiffs -
Appellants.

J. Richard Hammett, Baker & McKenzie LLP, Houston, Texas, (Scott M. Nelson,
Baker & McKenzie LLP; Paul J. Hickey and O'Kelley H. Pearson, Hickey &
Evans, LLP, Cheyenne, Wyoming, with him on the brief), for Defendants -
Appellees.

---

Before **HARTZ**, **HOLLOWAY**, and **GORSUCH**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

Wade E. Jensen and Donald D. Goff (Plaintiffs) represent themselves and a class of current and former employees of subsidiaries of Solvay America, Inc. who are at least 40 years old, participated in the Solvay America Companies' Pension Plan before January 1, 2005 (the old plan), and since that date have been subject to the plan's Retirement Account Balance Formula (the new plan), a type of formula known as a cash-balance formula.[1]  Plaintiffs sued Solvay (the plan sponsor and administrator) in the United States District Court for the District of Wyoming, claiming that Solvay's conversion to the cash-balance formula violated the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 829 (codified in 29 U.S.C. §§ 1001–1461, and in various sections of Title 26) and the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634.  Under ERISA they sought the benefits to which they would have been entitled if the old plan had continued.  *See* 29 U.S.C. § 1054(h)(6)(A).  Under the ADEA they sought double damages.  *See id.* §§ 216(b), 626(b).

---

[1]Solvay Chemicals, Inc., is a subsidiary of Solvay America, Inc.  We will refer to both companies and the Solvay America Companies Pension Plan, individually and collectively, as Solvay.

-2-

The district court granted Solvay's motion for summary judgment on all claims. Plaintiffs appeal, arguing (1) that the court improperly adopted verbatim the findings and analysis proposed by Solvay; (2) that Solvay violated ERISA by not properly disclosing the extent to which conversion to the cash-balance formula reduced benefits; and (3) that Solvay's actions in converting to the new plan violated the ADEA by negatively impacting older workers more than younger ones.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm on all but one issue. We reject the challenge to the district court's use of Solvay's proposed findings and conclusions. We hold that Solvay's notices to employees were adequate under ERISA except that they failed to explain how early-retirement benefits were calculated under the old plan. And we reject the ADEA claim because it was undisputed that the new plan conforms to the requirements of ADEA § 4(i), and under § 4(i)(4) the plan is therefore protected against Plaintiffs' challenge.

I. BACKGROUND

A. Solvay's Pension Plans

Before 2005, Solvay's pension plan determined the annual retirement benefit for an employee retiring at 65 (the normal retirement age) by multiplying the employee's years of qualified service by a percentage of the employee's

highest average five-year compensation[2] (plus a smaller percentage of the portion

of that compensation exceeding the "Covered Compensation" for persons of that

age in the current IRS table, *see, e.g.*, Rev. Rul. 98-53, 1998-2 C.B. 630 (1999

Covered Compensation Tables)).  If the employee took retirement benefits before

age 65, benefits were reduced based on age, though there was no reduction for

those retiring after reaching age 55 whose age plus service years totaled at least

85.

On January 1, 2005, Solvay's plan switched to a new method of calculating

benefits, a cash-balance formula.[3]  Under the new plan each employee has a

hypothetical retirement account, which is credited every quarter with a pay credit

(based on compensation for that quarter and the sum of age and years of service)

and an interest credit (equal to the account balance multiplied by the interest rate

on 30-year Treasury securities).  The employee may take the account balance as a

single lump-sum payment; or the employee may take the balance as a monthly

---

[2]More precisely, the compensation figure is the average annual
compensation received during the 60 highest-paid consecutive calendar months
out of the 120 months before retirement.

[3]The parties do not challenge the district court's conclusion that the new
plan, like the old, is a defined-benefit plan.  In a defined-benefit plan, participants
"have no claim to any particular asset that composes a part of the plan's general
asset pool, but, instead, receive an annuity based on the retiree's earnings history,
usually the most recent or highest paid years, and the number of completed years
of service to the company." *Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d
56, 62 (3d Cir. 2007) (internal quotation marks omitted).

annuity whose value is the actuarial equivalent of the account balance when the annuity begins, whatever the employee's age at that time. To calculate the actuarial equivalence, the plan uses the mortality table prescribed by the Secretary of the Treasury and an annual discount rate, which may change over the history of the plan but was assumed to be 5% when the plan conversion occurred.

The calculation under the new plan is somewhat more complicated for employees who had worked for Solvay while the old plan was in effect and continued to work for Solvay after December 31, 2004, under the new plan.[4] The opening balance of their hypothetical accounts is the actuarial equivalent of their normal-retirement benefit (which is, essentially, the monthly pension available if the employee begins receiving benefits at age 65) accrued under the old plan as of December 31, 2004. That is, roughly speaking, the opening balance would be a sum that could purchase an annuity that would pay the same monthly benefit as the already vested age-65 pension. Also, when an employee takes early retirement (before age 65), if the monthly benefit under the cash-balance formula is less than the monthly benefit that the employee had accrued under the old plan by December 31, 2004, the employee receives the monthly benefit accrued under the old plan.

---

[4]Not all employees who had previously worked for Solvay switched to the new plan. Employees were permitted to remain under the old plan if they had completed 10 years of service and were 50 years old by January 1, 2005.

Plaintiffs' concerns relate to two consequences of the conversion to the new plan. First, employees who continued to work for Solvay would not receive as large a pension as they would have if Solvay had retained the old plan. Second, employees who continued to work for Solvay might have to work several years before their early-retirement benefit increased beyond what had vested on the date of the plan conversion. Plaintiffs refer to the second consequence as a wear-away of benefits. They assert that both negative consequences affect older employees (those in Plaintiffs' class for this litigation) more than younger employees. It is worth taking a moment to explain both consequences.

To begin with, we describe how the benefits under the new plan would be less than what employees would have received if they had continued to be covered by the old plan as they worked for Solvay after December 31, 2004. Because of additional complexities that arise with respect to early-retirement benefits—complexities that we will address in the upcoming discussion of wear-aways—we will consider only the benefit that an employee would receive if the employee waited until age 65 to start taking benefits (although the employee may have ceased working for Solvay years earlier). On the first day under the new plan, the employee was entitled to the same age-65 retirement benefit as the employee would have received under the old plan. This result follows from the method by which the employee's initial cash-balance account was calculated.

That initial balance was the actuarial equivalent of the value of the age-65 pension. In other words, if on December 31, 2004, the employee had a vested benefit under the old plan of $1,000 a month when the employee reaches age 65, then the employee's initial cash balance under the new plan would have been the amount of money it would take to buy an annuity that would pay the employee $1,000 a month once the employee turns 65.[5]

From that date on, however, the benefits under the old and new plans diverge. Under the new plan the employee's age-65 pension benefit would increase every quarter because pay and interest credits are added to the cash-balance account. This increase, however, would not be as rapid as the benefit increase would have been under the old plan. As a result, if the employee continued working until age 65, the pension would be significantly less than it would have been if the old plan had continued, sometimes less than half as much. This is the first consequence that Plaintiffs have concerns about.

The description of the second consequence—wear-aways—is more complex. As we shall see, wear-aways result from Solvay's subsidy for early-

---

[5]This statement is not precisely accurate. Because of the way that mortality rates factor into computations under the new plan, the age-65 annuity may be slightly less than it would have been under the old plan. If so, the employee would receive the old-plan benefit. According to Plaintiffs' expert, however, the new-plan age-65 annuity would usually exceed the benefit vested under the old plan after the employee had worked under the new plan for about a year.

retirement benefits (received after reaching age 55 but before age 65) under the old plan, a subsidy that was not continued under the new plan.[6] We have already noted that on the day of conversion from the old plan to the new plan, the cash-balance-account pension at age 65 would be the same as the age-65 pension under the old plan. But the pension that the employee would receive upon retirement at an earlier age (say, age 55) would be more under the old plan than would be calculated under the cash-balance method. Under the old plan, an employee who decides to take early retirement would receive a monthly benefit equal to the benefit that the employee would receive at age 65, less a percentage of that amount for every year early the pension starts (unless one has reached age 55 and one's age plus service years equals at least 85, in which case there is no reduction). The annual percentage reduction is 3% if the employee had reached age 55 before leaving Solvay employment; otherwise it is 4% per year. Thus, one who leaves Solvay at age 55 and immediately begins to take retirement benefits will receive a monthly benefit that is 30% (10 x 3%) less than she would have received if she left work at age 55 but deferred receiving benefits until age 65. If

[6]As stated in the previous footnote, there could also be wear-aways caused by the use of mortality rates in new-plan computations. But we will ignore them, because the analysis in this opinion would not be affected by those less significant wear-aways, which are not a focus of Plaintiffs' claims.

the employee would have received $1,000 a month at age 65, the employee would receive $700 a month at age 55.

Under the new plan the early-retirement benefit is calculated differently. Just as the age-65 retirement benefit is determined by calculating the monthly annuity at age 65 that is actuarially equivalent to the hypothetical cash-balance account, the early-retirement annuity (say, at age 55) is also actuarially equivalent to the amount in the cash-balance account. If the cash-balance account is large enough at one point that it could purchase a $1,000 monthly annuity beginning at age 65, it could purchase a monthly annuity of something less than $500 beginning at age 55. (The new plan assumes an annual discount rate of 5%, so the reduction for taking retirement 10 years earlier would be more than 50%.) The important point is that interest rates and mortality rates are such that the ratio of the early-retirement monthly annuity at age 55 to the monthly annuity for an age-65 pension will be less under the new plan than under the old plan. If the employee would receive an age-65 monthly annuity of $1,000 under both plans, the age-55 monthly annuity would be $700 under the old plan (70% of the age-65 annuity) and less than $500 under the cash-balance formula (less than 50% of the age-65 annuity). To describe this from another perspective, for the early-retirement annuity to be actuarially equivalent to the age-65 annuity, the early-retirement benefit would need to be reduced by significantly more than 3% for

each year before age 65 that the employee begins receiving benefits. It cost the old plan much more when an employee decided to receive benefits before age 65 than if the employee deferred receipt until age 65. That is, the old plan subsidized early-retirement benefits. The new plan does not.

The reason for the wear-away effect is that even after conversion to the new plan, the employee is entitled to at least as high a benefit as the employee had accrued under the old plan before the conversion. An example will illustrate the point. Assume as before that at the time of conversion to the new plan, the employee's vested benefit would be a monthly annuity of $1,000 beginning at age 65. Because the opening cash balance under the new plan would be actuarially equivalent to that annuity, the employee would receive the same age-65 monthly annuity under the cash-balance calculation. But, as just explained, the early-retirement annuities under the two plans could be quite different. Under the old plan, the employee would be entitled to a monthly pension of $700 beginning at age 55 ($1,000 – (10 x 3% x $1,000)). In contrast, under the cash-balance plan the amount in the employee's account would pay for only a monthly annuity of less than $500 beginning at age 55. The employee, however, is entitled to the benefit that he had accrued under the old plan before the conversion, so the employee would receive $700 a month if he chose to begin receiving benefits at age 55. How then would things look after the employee works another year for

-10-

Solvay under the new plan? Although the employee's cash-balance account will have grown because of pay and interest credits, it is unlikely to grow enough to purchase a $700 monthly annuity at age 55. The employee is still entitled to a $700 monthly annuity beginning at age 55 (because that benefit had accrued under the old plan), but that is the same early-retirement benefit that the employee had been entitled to a year earlier. The extra year's work did not increase that benefit. (We should point out, though, that the age-65 annuity would always increase; there is no wear-away period with respect to that benefit (except as noted in footnotes 5 and 6) because the hypothetical-account balance increases each year and the initial balance was calculated as the amount that would pay for the age-65 annuity that had already accrued under the old plan.) This could go on for several years. The number of years of work it takes before the employee's early-retirement benefit under the cash-balance formula exceeds the vested benefit under the old plan is called the wear-away period. According to Plaintiffs' actuarial expert, Mr. Jensen's wear-away period would be 4.9 years and Mr. Goff's, 11.4 years.

## B.    Notice to Employees

In September 2004 Solvay sent materials about the plan change to its employees. The materials included a document called "204(h) Notice for Participants of the Solvay America Companies' Pension Plan," J. App., Vol. II at

342; a brochure on the FutureChoice program, which included the new cash-balance plan and an optional savings plan that enhanced previous benefits; and a personalized statement of estimated opening account balances. Between September and October, Solvay also hosted employee meetings to discuss FutureChoice and compare it to the prior plan.

Of particular importance to this appeal is the § 204(h) notice. The first detailed description in the notice is a section called "Summary of Plan Formula Changes." As set forth in the footnote, it describes benefit formulas under the old plan and the new plan.[7] The results of the conversion are later illustrated in a

_____

[7]The section states:

    Under the current plan, you earn a life annuity commencing at age 65 equal to a percentage of average earnings prior to retirement for each year of service (1.1% of average earnings plus 0.6% of average earnings in excess of Social Security covered compensation). Generally, this benefit cannot be taken as a lump sum. The current plan also allows you to retire as early as age 55 and receive a life annuity commencing on your early retirement date but reduced to reflect the earlier commencement. The current plan formula includes an early retirement subsidy.

    Under the new Retirement Account Balance Plan, your benefit is described in terms of an account balance, which you will be able to receive either as a lump sum or a life annuity. Your account grows each year with interest as well as pay credits. Interest credits vary each year depending on the prevailing yields on 30-year Treasury Bonds. The pay credits vary depending on your age and service as follows.

(continued...)

section entitled "Benefit Examples for Sample Employees," which we have also

[7](...continued)

| Points (Your Age + Years of Credited Service) | Credit Applied to All of Your Pension-Eligible Earnings | Credit Applied to Your Pension-Eligible Earnings in Excess of the Social Security Wage Base |
|---|---|---|
| Less than 40 | 2.50% | 1.25% |
| 40-59 | 3.00% | 1.50% |
| 60-79 | 4.00% | 2.00% |
| 80 or more | 5.00% | 2.50% |

The benefit you have earned or accrued as of December 31, 2004 under the current plan will be converted to your starting account balance under the new plan by taking the actuarial present value of your accrued benefit based on a 5% discount rate. Early retirement factors are not considered in this calculation. The present value calculation assumes that you do not retire until age 65. Therefore, the starting account balance does not include the value of the early retirement subsidy.

You can always elect to receive your account balance in the form of a life annuity under the new plan. Your life annuity at any retirement age will never be less than the retirement benefit you will have earned under the current plan as of December 31, 2004, which will include an early retirement subsidy, if applicable. In addition, the same optional forms of payment available under the current plan will be available under the new Retirement Account Balance Plan. The benefit you earn after December 31, 2004 under the new Retirement Account Balance Plan formula will not include early retirement subsidies.

J. App., Vol. II at 342–43. The notice later explains that the "[a]ctuarial equivalence used to convert the cash balance lump sum to a monthly annuity and to calculate the opening balance is based on the most recent IRS-mandated mortality table, GAR-94, and 5.0% interest." *Id.* at 347.

-13-

footnoted.[8]  The section provides tables that compare what 16 hypothetical

[8]The notice states:

The examples[1] on the next few pages are designed to help you understand how the plan changes may affect your future benefits. The examples compare benefits under the current benefit formula and the Retirement Account Balance Plan formula for representative employees (not real people) with different ages and years of service with Solvay America as of January 1, 2005. **Although they are not personalized, the examples will help you understand the potential impact of the formula changes on your plan benefits**. You should review the examples that are closest to your current age, service and compensation. **The following examples do not include the enhanced savings plan benefits.**

**The table compares benefits payable under the current formula (assuming that formula had remained in effect after January 1, 2005) and under the new formula.** The numbers shown in the new formula column take into account the Retirement Account Balance Plan benefit and the frozen benefit under the current formula as of December 31, 2004.

The assumptions used for the calculations are shown after the examples. Any changes in these assumptions would change the estimated projections shown in the examples. In fact, it is likely that actual experience will differ from these assumptions.

***About Tables A and B***

These tables are meant to illustrate a comparison between what employees are projected to have received if the plan would have kept its current formula in 2005 and beyond, and what they are projected to receive in the new formula. Tables A and B show sample participants with pensionable earnings during 2004 of $45,000 and $90,000, respectively.

The tables show the before-tax future benefits that would be paid to them at age 65 as a single life annuity (monthly payment for life). The first scenario (the left-hand portion of the table) assumes each of these people leaves Solvay America at age 65. The second scenario (the right-hand portion of the table) assumes each of these people leaves Solvay America at age 55.

(continued...)

-14-

[8](...continued)
The examples in tables A and B do not include the additional enhanced savings plan benefits.

[1]These examples are for illustrative purposes only.  Actual experience will differ from these assumptions.  Receiving this notice is in no way a guarantee of continued employment or payment of benefits.

*Benefit Examples*

**Monthly Benefits Payable as a Single Life Annuity
For an Employee With $45,000 in Eligible Pay**

| Table A | | Amount of Retirement Benefit at Age 65 If Employee Leaves at Age 65 | | | Amount of Retirement Benefit at Age 55 If Employee Leaves at Age 55 | | |
|---|---|---|---|---|---|---|---|
| | | Current Formula[1] | New Formula | | Current Formula[1] | New Formula | |
| Age at 1/1/2005 | Service at 1/1/2005 | Monthly Benefit | Monthly Benefit | Lump Sum | Monthly Benefit | Monthly Benefit | Lump Sum |
| 30 | 5 | $3,700 | $1,900 | $263,000 | $2,400 | $700 | $119,000 |
| 40 | 5 | 2,400 | 1,000 | 142,000 | 800 | 300 | 57,000 |
| 40 | 10 | 2,800 | 1,200 | 174,000 | 1,000 | 400 | 75,000 |
| 40 | 15 | 2,800 | 1,400 | 204,000 | 1,800 | 500 | 94,000 |
| 50 | 10 | 1,500 | 700 | 102,000 | 500 | 300 | 41,000 |
| 50 | 15 | 1,800 | 900 | 129,000 | 600 | 400 | 57,000 |
| 55 | 20 | 1,500 | 900 | 132,000 | 500 | 500 | 62,000 |
| 60 | 20 | 1,100 | 800 | 116,000 | 600[2] | 600[2] | 81,000[2] |

(continued...)

employees would be expected to receive as benefits under the new plan with what they would have been expected to receive if the old plan had continued.  There is

[8](...continued)

**Monthly Benefits Payable as a Single Life Annuity
For an Employee With $90,000 in Eligible Pay**

| Table B | | Amount of Monthly Annuity at Age 65 If Employee Leaves at Age 65 | | | Amount of Retirement Benefit at Age 55 If Employee Leaves at Age 55 | | |
|---|---|---|---|---|---|---|---|
| | | Current Formula[1] | New Formula | | Current Formula[1] | New Formula | |
| Age at 1/1/2005 | Service at 1/1/2005 | Monthly Benefit | Monthly Benefit | Lump Sum | Monthly Benefit | Monthly Benefit | Lump Sum |
| 30 | 5 | $8,500 | $3,700 | $527,000 | $5,000 | $1,400 | $239,000 |
| 40 | 5 | 5,400 | 2,000 | 284,000 | 1,700 | 700 | 114,000 |
| 40 | 10 | 6,400 | 2,500 | 348,000 | 2,200 | 900 | 151,000 |
| 40 | 15 | 6,400 | 2,900 | 407,000 | 3,700 | 1,100 | 187,000 |
| 50 | 10 | 3,400 | 1,500 | 208,000 | 1,000 | 500 | 85,000 |
| 50 | 15 | 4,100 | 1,900 | 262,000 | 1,300 | 800 | 116,000 |
| 55 | 20 | 3,600 | 2,000 | 282,000 | 1,200 | 1,200 | 135,000 |
| 60 | 20 | 2,600 | 1,900 | 264,000 | $1,500^2$ | $1,500^2$ | $186,000^2$ |

**The amounts shown above do not include the additional enhanced savings plan benefits.**

[1]  The benefit under the current formula is generally only payable as a monthly annuity.

[2]  For the sample employee who is age 60 with 20 years of service, the benefits shown in the last three columns are the retirement benefits payable at age 60 assuming the employee retires immediately.

J. App., Vol. II at 345–46.

also a section entitled "Early Retirement Benefits" that explains the concept of

wear-aways without using the term. It provides an example of an employee with a

six-year wear-away period. The section is reproduced in the footnote below.[9]

[9]The section states:

Some participants may notice that while their lump sum benefit always grows, their monthly benefit may not increase at the same rate or at all in some years. This could be due to changes in prevailing interest rates. The lower the interest rate used to convert account balances to annuities, the smaller the annuity equivalent of your account balance will be (and vice versa). Flat or small monthly benefit increases can also be due to the fact that the starting account balance used by [Solvay] does not take into account early retirement subsidies.

For example, take an employee who is age 54 as of December 31, 2004 with 12 years of service and earnings of $50,000. Her monthly benefit earned under the current plan as of December 31, 2004 is $500 payable for life beginning at age 65. Her opening balance in the new plan is $39,000. The following chart compares the monthly annuity earned under the current plan at December 31, 2004 (which will be payable to her as a protected minimum benefit) to the monthly annuity and lump sum benefit under the new plan that would be payable at each retirement age from 55 to 65.

| Age | Current Plan Monthly Benefit December 31, 2004 | New Plan | |
|-----|-----|-----|-----|
| | | Monthly Benefit | Lump Sum |
| 55 | $350 | $350 | $42,800 |
| 56 | 365 | 365 | 47,100 |
| 57 | 380 | 380 | 51,600 |
| 58 | 395 | 395 | 56,400 |
| 59 | 410 | 410 | 61,500 |
| 60 | 425 | 425 | 67,000 |
| 61 | 440 | 470 | 72,800 |
| 62 | 455 | 520 | 79,000 |
| 63 | 470 | 575 | 85,500 |
| 64 | 485 | 640 | 92,400 |
| 65 | 500 | 705 | 99,800 |

(continued...)

-17-

## C. District-Court Proceedings

Plaintiffs' complaint set forth six claims: (1) that Solvay violated ERISA § 204(h), 29 U.S.C. § 1054(h), by not adequately disclosing that the benefit-accrual rate was reduced under the new plan, that the reduction was a function of age, that early-retirement subsidies were eliminated, and that employees would suffer a wear-away period; (2) that the summary of material modifications (SMM) required by ERISA § 102(a), 29 U.S.C. § 1022(a), was deficient and Solvay violated its fiduciary duty under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), by failing to disclose the negative effects of the cash-balance plan; (3) that the change in Solvay pension plans discriminates against Plaintiffs based on age, thereby violating ADEA § 4(a), 29 U.S.C. § 623(a); (4) that the cash-balance plan violates the "133⅓% benefit accrual" requirement of ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B); (5) that the cash-balance plan violates the rule against forfeiture in ERISA § 203(a), 29 U.S.C. § 1053(a), because participants' rights to

---

[9](...continued)

> In this example, while the lump sum in the new plan continues to increase with pay and interest credits at each age, the actuarial equivalent monthly annuity will be no greater than the monthly annuity earned as of December 31, 2004 until this employee reaches age 61, when she will begin to earn an additional annuity benefit under the new plan formula.

J. App., Vol. II at 344.

accrued benefits are conditional; and (6) that under the new plan, the rate of benefit accrual based on a particular year's wage is greater for younger employees than older employees, violating both ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and ADEA § 4(i)(1)(A), 29 U.S.C. § 623(i)(1)(A). The district court certified the ERISA claims as a class action and the ADEA claims as a collective action.

Solvay moved for summary judgment on all six claims, and Plaintiffs moved for partial summary judgment on their first claim (under ERISA § 204(h)). The district court granted Solvay's motion.

On appeal Plaintiffs challenge only the dismissal of their first claim (failure to make adequate disclosures under ERISA § 204(h)), second claim (failure to make adequate disclosures under ERISA § 102 and under the fiduciary duty imposed by ERISA § 404(a)(1)), and third claim (age discrimination under ADEA § 4(a) because of the wear-away periods). They argue (1) that the district court did not apply the correct summary-judgment standard because much of its order was a verbatim adoption of Solvay's proposed findings and factual analysis; (2) that Solvay's notice under ERISA § 204(h) did not adequately disclose various benefit reductions; (3) that Solvay's SMM violated the disclosure requirement of ERISA § 102 and Solvay's fiduciary duty to disclose under ERISA § 404(a)(1); and (4) that the plan conversion violated ADEA § 4(a).

## II.     DISCUSSION

### A.     Standard of Review

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Jarvis v. Potter*, 500 F.3d 1113, 1120 (10th Cir. 2007). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Because this appeal is from a grant of summary judgment to Solvay, we view the evidence in the light most favorable to Plaintiffs. *See Cahill v. Am. Family Mut. Ins. Co.*, 610 F.3d 1235, 1236 (10th Cir. 2010).

Plaintiffs contend that because the district court adopted much of its order verbatim from Solvay's summary-judgment brief, it could not have applied the proper summary-judgment standard. But we need not decide whether we agree with Plaintiffs' characterization of the court's actions. Although we disapprove of verbatim adoptions, they do not affect our standard of review. *See Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 830 (10th Cir. 2005). In any event, our review is de novo; because we do not defer to the district court, its findings and analysis have no legal import for our review.

We first address Plaintiffs' disclosure claims under ERISA; then we consider their ADEA claim.

## B.    ERISA Disclosures

Plaintiffs fault Solvay for inadequately disclosing the effects of the new plan. In particular, they say that Solvay violated the following ERISA provisions: (1) § 204(h) and its implementing regulation, which require notice of significant reductions in benefit-accrual rates; (2) § 102 and its implementing regulation, which require a summary of any material modification to the plan; and (3) § 404(a)(1), which, according to Plaintiffs, imposes a general fiduciary duty that can require plan administrators to disclose information not specifically mandated by ERISA. We consider each argument in turn.

### 1.    Section 204(h) Notice

ERISA § 204(h) provides that when an amendment to a pension plan results in "a significant reduction in the rate of future benefit accrual," 29 U.S.C. § 1054(h)(1), the plan administrator must provide a notice to plan participants, *see id.* § 1054(h)(2). Under the original version of § 204(h) enacted in 1986, the only requirement for the content of the notice was that the notice "set[] forth the plan amendment and its effective date." Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272 § 11006(a)(2), 100 Stat. 82 (1986). But because of concern that employees often did not understand the

negative impact on benefits, *see* H.R. Rep. No. 107-51 (II), at 142–43 (2001), Congress amended the section in 2001 so that it now requires that the notice "be written in a manner calculated to be understood by the average plan participant and . . . provide sufficient information (as determined in accordance with regulations prescribed by the Secretary of the treasury) to allow applicable individuals to understand the effect of the plan amendment." 29 U.S.C. § 1054(h)(2); *see* Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16 § 659(b), 115 Stat. 38 (2001); *see also* 26 U.S.C. § 4980F(e) (stating same requirements as § 204(h)). The Secretary of the Treasury issued its final regulation implementing § 204(h) in 2003. *See* Notice of Significant Reduction in the Rate of Future Benefit Accrual, 68 Fed. Reg. 17277-02 (Apr. 9, 2003). It is codified at 26 C.F.R. § 54.4980F-1.

Plaintiffs do not say that Solvay's § 204(h) notice is inaccurate. But they argue that it fails to comply with various provisions of 26 C.F.R. § 54.4980F-1 that require additional information. They contend that the notice is deficient because (1) it "Does Not Describe the Drastic Reductions in Future Retirement Benefit in the Manner Prescribed by the Regulations," Aplt. Br. at 50; (2) it says nothing about how early-retirement benefits are calculated under either the old plan or the new plan; and (3) it does not disclose that employees in their 40s and early 50s may face a lengthy wear-away period.

### i.     Significant Reduction in Benefits

Plaintiffs assert that because the plan conversion "drastically lower[ed] . . . future benefit accruals," Aplt. Br. at 50, the notice should have set forth enough information for participants to estimate the magnitude of the reduction and to compare readily what the future accruals would be under the two plans.  They contend that the notice is inadequate in this respect because (1) it fails to state that there is a large reduction in future accrual rates or to describe that reduction in "percentage or dollar terms," as do the regulation's illustrative examples, *id.* at 51; (2) the examples in the tables "only show the <u>total</u> of the previously-earned benefits with the new benefits without identifying the part earned before or after the conversion," *id.* at 50; and (3) the notice does not disclose that the reduction was more severe for older employees.  In our view, however, the notice was adequate in disclosing reductions in benefits.

Section 54.4980F-1, A-11(a)(4)(i)(A) requires notices to "include sufficient information for each applicable individual to determine the approximate magnitude of the expected reduction for that individual."  Plaintiffs concede that the "reduction" referred to in the regulation is the reduction *of benefits*.  *See* Aplt. Br. at 50 ("The District Court's Order accurately stated that the Treasury regulations require disclosure of 'sufficient information for each applicable individual to determine the approximate magnitude of the expected reduction [of

benefits] for that individual.'" (quoting district court's order, J. App., Vol. I at 46; brackets in district-court order and Plaintiffs' brief)).  The regulation explicitly provides that the notice requirement can be satisfied "if the notice includes one or more illustrative examples showing the approximate magnitude of the reduction in the examples," 26 C.F.R. § 54.4980F-1, A-11(a)(4)(ii)(A), so long as the examples "bound the range of reductions," *id.* § 54.4980F-1, A-11(a)(4)(ii)(B), and are based on reasonable assumptions, *see id.* § 54.4980F-1, A-11(a)(4)(ii)(C).

In our view, Tables A and B in Solvay's § 204(h) notice satisfy these requirements.  They provide illustrative examples comparing the expected monthly benefit under the new plan with the expected monthly benefit that would have been earned if the old plan had continued; the examples concern employees of different ages, compensation, service years, and time of retirement.  By finding the example most like himself, an employee can estimate his benefit reduction in dollar terms.  Nothing in these tables hides the fact that the new plan significantly reduces employees' monthly benefits.  On the contrary, these comparisons show that employees are almost always worse off after the conversion; for instance, a 50-year-old employee with 10 years of service, who makes $45,000 a year, and who plans to retire at 65, would have received $1,500 a month under the old plan; but he will receive less than half that amount—$700 a month—under the new

-24-

plan. Plaintiffs have not complained that the examples fail to bound the range of reductions in annuities or that the assumptions are unreasonable.

Plaintiffs do complain, however, that Solvay's notice does not describe "future accruals under the new formula in percentage terms that can be readily compared to the 1.1% of final pay offered by the old formula." Aplt. Br. at 53. They point to § 54.4980F-1, A-11(b), Example 4. True, the notice in Example 4 complies with what Plaintiffs would require. The example concerns a conversion of a plan like Solvay's old plan to a cash-balance plan. Unlike Solvay's new plan, however, there was no carryover from the old plan to the hypothetical cash-balance account, which thus started with $0. *See* 26 C.F.R. § 54.4980F-1, A-11(b), Example 4(i)(B). The vested benefit from the old plan was simply added to the cash-balance benefit under the new plan. *See id.* The notice in Example 4 contains only three illustrations, one of which is described in detail. *See id.* at Example 4(i)(D). It hypothesizes a 49-year-old employee with 10 years of service who is earning $50,000. *See id.* The notice projects that from age 49 to 65 the employee will accrue an average annual benefit of .57% of the employee's highest three-year pay, compared to 1.5% under the old plan. *See id.* But the regulation says nothing to require such a comparison of annual accrual rates. The test in the regulation is whether the notice provides enough information to allow an employee "to determine the approximate magnitude of the expected reduction."

*Id.* § 54.4980F-1, A-11(a)(4)(i)(A). Perhaps some employees would prefer the information to be in the form of annual accrual rates. But many (we suspect most) would prefer to know the bottom line—what will I get under the new plan compared to what I would have gotten had the old plan continued. The tables provided by Solvay are more informative in that regard than the three illustrations in Example 4. And it is worth noting that the final sentence of Example 4 states that § 54.4980F-1, A-11(a)(4)(ii) would have been "satisfied if the notice instead directly stated the amount of the monthly pension that would have accrued over the 16-year period from age 49 to age 65 under the old formula." *Id.* § 54.4980F-1, A-11(b), Example 4(ii); *see id.* at Example 5(ii) (containing similar statement regarding early-retirement pension). That sentence is inconsistent with a requirement that reductions be stated in terms of annual accrual rates.

Although Plaintiffs also challenge Solvay's notice because it does not "describe the reductions in future benefits in percentage or dollar terms," Aplt. Br. at 51, the regulation does not require that the notice compute the reduction. It is enough if the notice provides easily compared figures (such as accrual rates or monthly benefits) for the plan before and after conversion. The notice in Example 4, for instance, does not subtract the two accrual rates to obtain the difference (the reduction in rates); and the final sentence of the example endorses a notice that states the "amount of the monthly pension" accrued under the new

cash-balance plan, not the amount by which this pension is less than it would have been under the old plan. The examples in Solvay's tables provide easily compared figures—the monthly benefits under the old and new plans—so the notice is adequate in that regard.

We are also not persuaded by Plaintiffs' claim that the notice is defective in that the benefits that are compared are the benefits that the employee would earn as a result of the employee's entire tenure with Solvay. The tables in the notice take, for example, an employee who worked for Solvay for 10 years before the conversion and then state the expected annuity amount assuming the conversion and the expected amount assuming that there had been no conversion. Plaintiffs argue that the comparisons should have been between how much additional annuity the employee would earn after the conversion and how much additional the employee would have earned in that period had there been no conversion. They again cite Example 4, which so distinguishes the benefits. All that the regulation requires, however, is information allowing an easy comparison of the benefits expected after the conversion with those that would have been expected had there been no conversion. Solvay's notice provides that information. Some employees may prefer a comparison in the form demanded by Plaintiffs; but others may not. In any event, an employee who reviews the examples in Solvay's

notice will have no doubt that the reduction in the annuity is due totally to the decline in future accruals resulting from the conversion to the new plan.

As for Plaintiffs' contention that the notice fails to mention that the reduction in the rate of future accruals was more severe for older employees, that omission violates no provision of the regulation. We also note that if an employee wishes to see whether other employees fare better under the conversion than she does, the tables in Solvay's notice provide ample information with which to do so.

### ii.    Calculation of Early-Retirement Benefits

Plaintiffs argue that the notice "did not disclose how early retirement benefits are calculated before and after the cash balance amendment." Aplt. Br. at 42–43. They rely on 26 C.F.R. § 54.4980F-1, A-11(a)(3)(ii), which states that when an amendment

> reduces an early retirement benefit or retirement-type subsidy . . ., the notice must describe how the early retirement benefit or retirement-type subsidy is calculated from the accrued benefit before the amendment, [and] how the early retirement benefit or retirement-type subsidy is calculated from the accrued benefit after the amendment.

We first address the early-retirement benefit under the old plan.

Under the old plan an employee's early-retirement benefit was derived from the normal-retirement benefit—that is, the monthly pension payable if the employee begins receiving the pension at age 65. Whatever that normal monthly

benefit was, it was reduced by 3% for every year before age 65 that the employee began receiving benefits, if the employee was at least 55 before leaving Solvay's employment. The benefit was reduced by 4% each year if the employee left before age 55. There was no reduction from the normal-retirement benefit, however, if the employee left the company after reaching age 55 and the employee's age plus years of service totaled at least 85 on the date of termination. As pointed out above, an employee's early-retirement benefit had a greater actuarial value than the normal-retirement benefit. That is, based on mortality data (the number of years that the employee will probably be receiving benefits) and expected interest rates, the reduction in benefits for early retirement should exceed 3% or 4% per year if the cost to the company for the benefit is to be the same as for normal retirement. In other words, the company subsidized early retirement under the old plan. Because the new plan provides no early-retirement subsidies, the disclosure requirement of § 54.4980F-1, A-11(a)(3)(ii) was triggered by Solvay's conversion.

We agree with Plaintiffs that the regulation therefore required Solvay's notice to describe how the early-retirement benefit was calculated under the old plan. And we further agree that the notice contains no such description. All that Solvay can say in its defense on appeal is to emphasize the language in the notice stating: "The current plan also allows you to retire as early as age 55 and receive

-29-

a life annuity commencing on your early retirement date but reduced to reflect the earlier commencement.  The current plan formula includes an early retirement subsidy."  J. App., Vol. II at 343.  We fail to see how an employee could calculate early-retirement benefits with just this information.  The notice does not comply with the regulation.

On the other hand, the notice adequately describes how to calculate early-retirement benefits under the new plan.  It informs employees (1) that their "benefit is described in terms of an account balance, which you will be able to receive either as a lump sum or a life annuity," *id.*; (2) that the account balance is based on the present value of their benefits under the old plan, plus pay credits and interest credits (including how they are calculated); and (3) that to convert a cash-balance lump sum into a monthly annuity, employees must use "the most recent IRS-mandated mortality table, GAR-94, and 5.0% interest," *id.* at 347.  The notice also advises employees that, unlike the old plan, the new plan offers no early-retirement subsidies.  There is, however, one lapse in the disclosure of early-retirement benefits under the new plan.  Even after conversion to the new plan, an employee is entitled to the early-retirement benefit accrued before the conversion if that benefit exceeds what has accrued under the new cash-balance plan.  One could therefore say that the notice does not fully disclose how early-

retirement benefits are calculated under the new plan insofar as the new plan incorporates some benefits under the old plan.

We therefore conclude that Solvay's notice failed to comply with the requirements for disclosure of early-retirement calculations. Whether Plaintiffs are entitled to relief, however, depends on whether there was an "egregious failure" in compliance. 29 U.S.C. § 1054(h)(6)(A). We remand to the district court to resolve that issue (although it may also consider any defense not addressed in this opinion that Solvay may have to this claim).

### iii.    Wear-Away Periods

Plaintiffs also fault Solvay's notice for inadequate disclosure of another matter relating to early retirement. They contend that the "notice did not include the required information from which individuals can determine whether they will be subject to wear-aways, . . . [or] examples to illustrate the 'range of reductions' as directed by [26 C.F.R. § 54.4980F-1, A-11(a)(4)(ii)(B)]." Aplt. Br. at 47. Further, they say, the notice did not disclose the duration of the wear-away periods. But these contentions are based on a misreading of the regulation.

After declaring that the requirement to disclose the reduction in benefits can be satisfied by providing examples, the regulation states that such examples are required for conversions in two circumstances:

> [1] any change from a traditional defined benefit formula to a cash balance formula or [2] a change that results in a period of time

-31-

during which there are no accruals (or minimal accruals) with regard to normal retirement benefits or an early retirement subsidy (a wear-away period).

26 C.F.R. § 54.4980F-1, A-11(a)(4)(ii)(A).[10]  Both circumstances are present in the Solvay conversion.  It is both a conversion from a traditional defined-benefit formula to a cash-balance formula, and the conversion created wear-away periods.

The next provision then describes what should be covered by the examples. It states:

> Where an amendment results in reductions that vary (either among participants, as would occur for an amendment converting a traditional defined benefit formula to a cash balance formula, or over time as to any individual participant, as would occur for an amendment that results in a wear-away period), the illustrative example(s) provided in accordance with this paragraph (a)(4)(ii) must show the approximate range of the reductions.

*Id.* § 54.4980F-1, A-11(a)(4)(ii)(B).  As we understand the quoted language, it says nothing about disclosing the duration of wear-away periods or even about

---

[10]The full text of the provision states:
(ii) Illustrative examples—(A) Requirement generally.  The requirement to include sufficient information for each applicable individual to determine the approximate magnitude of the expected reduction for that individual under (a)(4)(i)(A) of this Q&A-11 is deemed satisfied if the notice includes one or more illustrative examples showing the approximate magnitude of the reduction in the examples, as provided in this paragraph (a)(4)(ii).  Illustrative examples are in any event required to be provided for any change from a traditional defined benefit formula to a cash balance formula or a change that results in a period of time during which there are no accruals (or minimal accruals) with regard to normal retirement benefits or an early retirement subsidy (a wear-away period).

-32-

using the term *wear-away*. It simply requires that the "illustrative example(s) . . . show the approximate range of the reductions." *Id.* The concept of a wear-away may provide an interesting, or even useful, lens to examine a conversion from one pension plan to another; but a wear-away is not itself a "reduction." A reduction is a decrease in the anticipated pension benefit. Thus, all that the regulation requires with respect to wear-aways in early-retirement benefits is that the illustrations "show the approximate range of the reductions" in early-retirement benefits. *Id.* In that regard, the Solvay notice appears to be adequate. The tables in the notice give 14 examples of changes in monthly benefits resulting from the conversion for employees retiring at age 55 (and two examples for retirement at 60). The examples do not conceal the large reductions that may occur, with several examples showing reductions greater than two-thirds of the benefit under the old plan. Plaintiffs say that the examples do not show the range in *wear-away periods*; but they have made no argument that the range of examples is unrepresentative, misleading, or otherwise inadequate in showing the extent of the reduction in *early-retirement benefits*.

And Solvay's notice does more. It contains a section entitled "Early Retirement Benefits" that alerts employees to the possibility that there may be years in which those benefits do not grow. The section, which is reproduced earlier in this opinion, *see* n.9, *supra*, does not contain the word *wear-away*, but

the concept is presented.  The section states:  "Some participants may notice that while their lump sum benefit always grows, their monthly benefit may not increase at the same rate or at all in some years.  This could be due to . . . the fact that the starting account balance used by [Solvay] does not take into account early retirement subsidies."  J. App., Vol. II at 344.  Further, although the illustration in the section would in itself be inadequate to inform employees of the potential decline in early-retirement benefits, it describes a six-year wear-away period and should assist employees in understanding the wear-away concept.

Accordingly, we reject Plaintiffs' argument that Solvay's notice violated § 54.4980F-1 because of an inadequate description of wear-aways.

### 2.    Summary of Material Modification

ERISA entitles plan participants to receive "[a] summary of any material modification in the terms of the plan and any change in the information required [to be in a summary plan description]," and the summary must be "written in a manner calculated to be understood by the average plan participant."  29 U.S.C. § 1022(a); *see* 29 C.F.R. § 2520.104b-3(a) (implementing § 1022(a)).  The information required to be in a summary plan description is set forth in 29 U.S.C. § 1022(b).  *See* 29 C.F.R § 2520.102–3(*l*) (implementing § 1022(b)).

Solvay's summary, its SMM, consists of the § 204(h) notice and the FutureChoice brochure.  Plaintiffs contend that the SMM did not adequately

disclose (1) the "changes in reduction factors for early retirement," Aplt. Br. at 57; (2) "the legally-required protection of early retirement benefits offered under the prior plan or the loss or forfeiture of the value of those features if employees accept lump sum distributions before 55," *id.* at 57–58; or (3) "the general classes of employees subject to wear-away or the approximate range of such wear-aways," *id.* at 57.

We are not convinced that the SMM was defective. With respect to Plaintiffs' first contention, aside from the failure to disclose how early-retirement benefits were calculated under the old plan, the SMM adequately described how the new plan differed from the old. And we need not decide whether that failure constituted an independent violation of § 1022(a), because we have already held that the failure violated 26 C.F.R. § 54.4980F-1, A-11(a)(3)(ii); and Plaintiffs have not suggested that any additional remedy would be available for a violation of § 1022(a).

As for any other possible defects in the SMM, we would assume that a notice that complies with the disclosure requirements of § 204(h) would satisfy in that respect the requirements for an SMM. We apparently are not alone in that regard. When the § 204(h) regulation was published in 2003, the introduction to the regulation stated: "The Department of Labor has advised the IRS that a plan administrator who provides a section 204(h) notice to applicable individuals in

accordance with this final rule will be treated as having furnished those individuals with an SMM regarding the section 204(h) amendment." 68 Fed. Reg. at 17278.

In any event, we will briefly address Plaintiffs' other two contentions. They rely on the requirement that a summary plan description must "describe the plan's provisions relating to *eligibility*," 29 C.F.R. § 2520.102-3(j) (emphasis added), and "clearly identify[] circumstances which may result in . . . denial, *loss, forfeiture*, suspension, offset, reduction, or recovery . . . of any benefits that a participant or beneficiary might otherwise *reasonably expect* the plan to provide on the basis of the description of benefits," *id.* § 2520.102-3(*l*) (emphases added).

First, Plaintiffs complain that the SMM did not disclose the "loss or forfeiture of the value of [early-retirement benefits] if employees accept lump sum distributions before age 55." Aplt. Br. at 57–58. The contention is obscure. But to the extent that we understand it, we reject it. Even were we to agree that one change in the Solvay plan was the introduction of the possibility that an employee could lose early-retirement benefits by taking a lump-sum distribution before age 55, no employee who chooses a lump-sum benefit reasonably expects to retain any annuity benefit. Solvay's documents clearly state that an employee must make an election between alternative benefits. The loss of the annuity is not

an unexpected forfeiture, and therefore need not be disclosed in a summary plan description or an SMM.

As for disclosures regarding wear-aways, the authorities cited by Plaintiffs are either not persuasive or readily distinguishable. We disagree with the suggestion in *Humphrey v. United Way of Tex. Gulf Coast*, 590 F. Supp.2d 837, 847 n.6 (S.D. Tex. 2008), that a wear-away provision is an eligibility requirement in that "Participants [must] wear away their prior pension before they will receive benefits under their current one." Wear-away under Solvay's plan is a consequence of a change in plan terms, not a fact that an administrator must determine to assess eligibility for a benefit. Therefore, wear-away need not be disclosed as a new eligibility requirement after conversion.

And the other decisions cited by Plaintiffs as requiring disclosure of wear-aways involved significant failures to disclose that are not present, or even approximated, here. In *Richards v. FleetBoston Fin. Corp.*, No. 3:04-cv-1638 (JCH), 2006 WL 2092086, at *8 (D. Conn. July 24, 2006), the notice did not properly explain how the opening cash-balance account was calculated. In *Amara v. CIGNA Corp.*, 534 F. Supp.2d 288, 340, 346 (D. Conn. 2008), the employer admitted that it had never informed employees that they may not accrue benefits under the new cash-balance plan, and the court found that the employer had made "material misrepresentations suggesting benefit increases," *id.* at 339, and

-37-

"offered statements that misled plan participants into believing that significant reductions in the rate of future benefit accrual were not a component or a possible result of" the conversion to the new plan, *id.* at 340. The employer had provided no before-and-after examples of changes in the plan. *See id.* at 343.

In sum, we hold that Solvay's SMM was not deficient, except for the possibility that § 1022(a) required disclosure of the old plan's method of calculating early-retirement benefits. We need not address that possible violation, however, because we have held that the failure to disclose violates 26 C.F.R. § 54.4980F-1, A-11(a)(3)(ii), so remand is required in any event.

### 3.  Fiduciary Duty

Plaintiffs' remaining criticism of Solvay's disclosure is that it "Breached Its Fiduciary Duties By Refusing to Provide Information in Response to Inquiries from Employees." Aplt. Br. at 58. Their complaint alleges that this fiduciary duty to disclose arises under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), although their discussion of the issue in their appellate brief does not cite that provision.

It is an interesting question whether the fiduciary duties imposed by § 404(a)(1) include a duty of disclosure. The Supreme Court left the issue open in *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) ("[W]e need not reach the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries."). The

circuit courts are divided on the matter. Some have held that any duty to disclose is imposed only by ERISA's specific disclosure requirements. *See Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 657 (4th Cir. 1996); *Ehlmann v. Kaiser Found. Health Plan of Tex.*, 198 F.3d 552, 555 (5th Cir. 2000); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 405 (6th Cir. 1998) (en banc). Others, however, have held that § 404(a) can impose additional duties of disclosure. *See Glaziers & Glassworks Union Local No. 252 Annuity Fund v. Newbridge Sec. Inc.*, 93 F.3d 1171, 1181–82 (3d Cir. 1996); *Shea v. Esensten*, 107 F.3d 625, 628–29 (8th Cir. 1997); *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750–51 (D.C. Cir. 1990).

We need not enter the debate, however, because Plaintiffs have not adequately presented the issue in their appellate brief. They have not specified a single employee question to which Solvay did not respond. Without more, we cannot determine what, if any, fiduciary duties were violated. Appellate courts will not address abstract legal issues that are not tied to specific events. *See United States v. Allen*, 603 F.3d 1202, 1209 (10th Cir. 2010) (A court will not "analyze the record for [the appellant] to determine whether a violation occurred. That task was for [appellant's] counsel and it has not been performed."). We therefore decline to consider this argument. *See Cisneros v. Aragon*, 485 F.3d

1226, 1233 (10th Cir. 2007) (arguments not adequately addressed on appeal are waived).

## C. ADEA Claim

Plaintiffs' final claim is that Solvay's conversion to a cash-balance formula violated § 4(a) of the ADEA, which makes it unlawful for employers to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In district court Plaintiffs contended that a wear-away consequence of the conversion was that "older, longer-service employees will accrue no additional benefits for their years of employment with [Solvay] in 2005, 2006, 2007 and subsequent years. Younger or recently hired employees will not experience a similar benefit freeze." J. App., Vol. I at 201. During this period, Plaintiffs alleged, Solvay "incurs no cost for older, longer-service employees' pensions. At the same time, [Solvay] incurs costs for younger employees' pensions." *Id.* at 202.

Solvay argues that this claim fails because of the ADEA provision specifically addressing benefit accruals in pension plans. Subsection (i) of ADEA § 4 (entitled, "Employee pension benefit plans; cessation or reduction of benefit

accrual or of allocation to employee account . . . ,” 29 U.S.C. § 623(i)) broadly

prohibits age discrimination with respect to benefit accruals:

> Except as otherwise provided in this subsection, it shall be unlawful
> for an employer, an employment agency, a labor organization, or any
> combination thereof to establish or maintain an employee pension
> benefit plan which requires or permits—
>
>> (A) in the case of a defined benefit plan, the cessation of
>> an employee’s benefit accrual, or the reduction of the
>> rate of an employee’s benefit accrual, because of age
>> . . . .

*Id.* § 623(i)(1). But, as foreshadowed by the introductory clause, the subsection

proceeds to set forth several safe harbors—practices that do not violate § 4. Of

special importance is § 4(i)(4), which states: “Compliance with the requirements

of this subsection with respect to an employee pension benefit plan shall

constitute compliance with the requirements of this section relating to benefit

accrual under such plan.” *Id.* § 623(i)(4). Section 4(i) was added to the ADEA in

1986. The conference report accompanying the amendment explained:

> It is the intention of the conferees, in adopting the amendments to
> ADEA (new sec. 4(i)), that the requirements contained in section 4(i)
> related to an employee’s right to benefit accruals with respect to an
> employee benefit plan . . . shall constitute the entire extent to which
> ADEA affects such benefit accrual and contribution matters with
> respect to such plans . . . .

H.R. Rep. No. 99-1012, at 144 (1986) (Conf. Rep.), *as reprinted in* 1986

U.S.C.C.A.N. 3868, 4027.

Solvay contends that paragraph (4) bars Plaintiffs' claim because (1) Plaintiffs do not challenge the district court's ruling that Solvay's plan complies with § 4(i), and (2) Plaintiffs do not contest that their ADEA "wear-away claim relates to benefit accrual under [Solvay's] Plan." Aplee. Br. at 27. We agree.

Plaintiffs raise two counterarguments, but neither is persuasive. First, they argue that they are making a disparate-impact claim under the ADEA, not a disparate-treatment claim, and that § 4(i)(4) bars only disparate-treatment claims. The distinction between the two types of claims is well-established. In general, disparate treatment occurs when an "employer simply treats some people less favorably than others" because of a certain characteristic, such as race or age; disparate impact, on the other hand, "involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). But Plaintiffs' contention that the distinction is relevant to § 4(i)(4) is made out of whole cloth. Nothing in the statutory language supports it. On the contrary, § 4(i)(4) states broadly that compliance with § 4(i) "shall constitute compliance with the requirements of this section relating to benefit accrual." 29 U.S.C. § 623(i)(4). Plaintiffs' claim is raised under § 4, and compliance with § 4(i) satisfies § 4, period.

-42-

In support of their contention, Plaintiffs cite two district-court opinions that appear to state that disparate-impact claims can be brought under § 4(a) despite compliance with § 4(i). *See George v. Duke Energy Ret. Cash Balance Plan*, 560 F. Supp.2d 444 (D.S.C. 2008); *Vaughn v. Air Line Pilots Ass'n, Int'l*, 395 B.R. 520 (E.D.N.Y. 2008). But we decline to follow them. We cannot tell how the cases were argued to those courts; but we are struck by the failure to cite § 4(i)(4) in either opinion. *See Nw. Airlines, Inc. v. Phillips*, 594 F. Supp.2d 1075, 1089 (D. Minn. 2009) (noting failure of *George* to consider § 4(i)(4)). We choose to follow the plain language of the statute rather than court opinions that ignore the statute.

Plaintiffs' second counterargument is that "§ 4(i) does not regulate early retirement benefits." Aplt. Br. at 35. They rely on ADEA § 4(i)(6), which states: "A plan shall not be treated as failing to meet the requirements of paragraph (1) solely because the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals . . . ." 29 U.S.C. § 623(i)(6). According to Plaintiffs, this language means that subsidized early-retirement benefits fall outside § 4(i)'s scope. But, they continue, after § 4(i) was added to the ADEA in 1986, a 1990 amendment clarified that § 4(a) governs benefit plans. Section 4(a) bars age discrimination against employees "with respect to . . . compensation, terms, conditions, or privileges of employment," *id.* § 623(a)(1);

and the amendment stated that "[t]he term 'compensation, terms, conditions, or privileges of employment' encompasses all employee benefits, including such benefits provided pursuant to a bona fide employee benefit plan," *id.* § 630(*l*). Thus, Plaintiffs reason, the 1990 amendment brought subsidized early-retirement benefits (which were not within § 4(i)'s scope) within § 4(a)'s scope.

We disagree. The principal problem with Plaintiffs' analysis is that it contradicts the statutory language. The 1990 Amendment on which they rely did not repeal § 4(i)(4), which states that compliance with subsection (i) constitutes compliance with § 4 insofar as benefit accrual is concerned. If the 1990 Congress intended that § 4(i)(4) not apply to early-retirement subsidies addressed in § 4(i)(6), it surely would have found some language to express that intent. *Sub silentio* repeals are not favored in the law. *See, e.g.*, *Dir. of Revenue of Mo. v. CoBank ACB*, 531 U.S. 316, 323 (2001). Moreover, the natural reading of § 4(i)(6) is not that subsidized early-retirement benefits fall outside the scope of § 4(i). Rather, its clear import is that plans do not violate the ADEA when they disregard early-retirement subsidies in determining benefit accruals. Plaintiffs' concern is that § 4(i)(6) protects a practice that they believe to be age discrimination. We agree that one could make a decent argument that wear-aways can discriminate on the basis of age. But it appears to be for that very reason that

paragraph (6) was enacted—the paragraph removes such age-discrimination claims from debate (at least when § 4(i) is otherwise satisfied).

We reject Plaintiffs' arguments on their ADEA claim.

## III. CONCLUSION

We AFFIRM the judgment of the district court with respect to Plaintiffs' ADEA claim and with respect to all of their ERISA claims except the claim based on the failure of the § 204(h) notice to describe the calculation of early-retirement benefits. We REVERSE and REMAND for further proceedings on that ERISA claim.