**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 11, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

WAYNE TOMLINSON, individually and on behalf of all others similarly situated; ALICE BALLESTEROS, individually and on behalf of all others similarly situated; GARY MUCKELROY, individually and on behalf of all others similarly situated,

     Plaintiffs–Appellants,

v.

EL PASO CORPORATION; EL PASO PENSION PLAN,

     Defendants–Appellees.

_____

EQUAL EMPLOYMENT ADVISORY COUNCIL; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

     Amici Curiae.

No. 10-1385

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:04-CV-02686-WDM-CBS)**

Stephen R. Bruce, Stephen R. Bruce Law Offices, Washington D.C. (Allison C. Pienta, Stephen R. Bruce Law Offices, Washington D.C., and Barry D. Roseman, McNamara, Roseman, Martinez & Kazmierski, LLP, Denver, Colorado, with him on the briefs), for the Plaintiffs-Appellants.

Darren E. Nadel, Littler Mendelson, P.C., Denver, Colorado (Stephanie L. Hankin, Littler Mendelson, P.C., Denver, Colorado, and Chistopher J. Rillo, Schiff Hardin LLP, San Francisco, California, with him on the briefs), for the Defendants-Appellees.

Robin S. Conrad and Shane B. Kawka, National Chamber Litigation Center, Inc., Washington, D.C., and Rae T. Vann, Norris Tysse, Lampley & Lakis, LLP, Washington, D.C., filed an Amici Curiae brief for Equal Employment Advisory Council and Chamber of Commerce of the United States of America, on behalf of Defendants-Appellees.

---

Before **KELLY**, **BALDOCK**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

In this putative class action, Wayne Tomlinson, Alice Ballesteros, and Gary Muckelroy appeal the dismissal of their claims against El Paso Corporation and the El Paso Pension Plan (collectively "El Paso") brought under the Age Discrimination in Employment Act ("ADEA") and the Employee Retirement Income Security Act ("ERISA").[1]

Plaintiffs' claims concern "wear-away periods" that occurred during El Paso's transition to a new pension plan. They contend that the wear-away periods violate the ADEA's prohibition on age discrimination and the anti-backloading and notice provisions of ERISA. But El Paso's transition favored, rather than discriminated against, older employees; and the plan was frontloaded, rather than backloaded. We hold that ERISA does not require notification of wear-away periods so long as employees are

---

[1] Some of the potential class members are former employees of companies acquired by El Paso. Although these employees have slightly different pension plans, neither party argues that they should be treated separately for the purpose of our analysis.

informed and forewarned of plan changes. El Paso provided sufficient notice and warning. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we therefore affirm.

## I

In 1996, El Paso ended its traditional pension plan and switched to a "cash balance plan." The old plan was a typical defined-benefit pension plan; employees received retirement benefits equal to a percentage of their final average monthly earnings multiplied by their years of service. Under the new cash balance plan, a percentage of each employee's pay was deposited into a hypothetical cash balance "account."[2] The percentage of these "pay credits" increased with an employee's age and years of service. In addition, quarterly "interest credits" were added to the hypothetical account based on a specified interest rate. This interest rate was the same for all El Paso employees. The cash balance plan adopted by El Paso was, as the company informed its employees, less generous than its previous traditional pension plan.

Beginning January 1, 1997, eligible employees of El Paso entered a five year "transition period." At the beginning of the transition period, employees were credited with a cash balance account actuarially equivalent to their accrued benefit—the amount payable upon retirement—under the old plan. The cash balance account would then increase with pay and interest credits. During the transition period, plan participants

---

[2] Because cash balance accounts are purely hypothetical—that is, there is no actual account containing the "credits"—such plans are treated as defined-benefit plans under ERISA. See 29 U.S.C. § 1002(34), (35); see also Berger v. Xerox Corp. Ret. Income Guar. Plan, 338 F.3d 755, 757 (7th Cir. 2003) ("The reason for the scare quotes in our description of the cash balance plan is that the employee has no actual account, the employer makes no contributions to an employee account, and so there is no account balance to which interest might be added.").

would also accrue benefits under the terms of the old plan. At the conclusion of the transition period, participants ceased accruing benefits under the traditional formula, but their cash balance accounts continued to grow. A participant's accrued benefit under the traditional plan at the end of the transition period is referred to as the "minimum benefit." Upon retirement, plan participants were entitled to choose the greater of the minimum benefit or the cash balance account benefit.

At the conclusion of the transition period, many participants had a minimum benefit that was higher than the value of their cash balance account. For some of them, the value of their cash balance account would not eclipse the value of their minimum benefit under the old plan for several years. This period, during which the new cash balance plan catches up to the minimum benefit, is called a "wear-away period."[3] Because the plan adopts a "greater of" formulation (allowing employees to collect under whichever formula provided higher benefits) and because benefits under the old plan are frozen at the end of the transition period, the accrued benefit payable at normal retirement age is effectively frozen while a plan participant is in a wear-away period. Older employees were particularly likely to experience wear-aways, and their wear-aways tended to be longer than younger employees' wear-aways.

El Paso informed employees of its planned transition in a "Business Update" circulated in January 1996. It stated that the company would move from its traditional

---

[3] Congress amended ERISA and the ADEA to prohibit wear-aways in cash balance conversions effective June 29, 2005. Pension Protection Act of 2006, P.L. 109-280, § 701(a)(1), (c)(1), 120 Stat. 780, 982, 989 (codified at 29 U.S.C. §§ 1054(b)(5) and 623(i)(10)).

plan to a cash balance plan and noted that "employees will earn future benefits at a lower rate than under" the prior plan. El Paso provided more details in a letter in October 1996, which warned that the new plan was "no longer at the top of the range," that "[t]he hard truth is that those who are not prepared may have to postpone retirement," and that after a transition period "the current pension plan formula will be frozen for [some] participants and they will not earn any additional benefits under the current plan." In the same month, El Paso distributed a brochure which summarized the cash balance plan and explained the transition in rosier terms. The brochure contained prominent statements such as "[y]ou can't lose," "[t]here's no risk," and "your account can only go up." El Paso also gave employees individualized account statements in 1999, which illustrated the status of their cash balance accounts and minimum benefits.

In 2002, El Paso provided employees a Summary Plan Description ("SPD") which explained in detail the calculation of benefits, the transition period, and the "greater of" alternative between the cash balance plan and the minimum benefit. Although some of the plaintiffs did not read the SPD, Tomlinson consulted the SPD to find certain information. Neither the SPD nor the 1996 notifications contained any explicit reference or warning regarding wear-away periods described as such.

Tomlinson filed a claim with the Equal Employment Opportunity Commission on July 21, 2004, alleging that the transition unlawfully discriminated against older employees. Several participants in El Paso's retirement plan, including Tomlinson, later filed this class action suit alleging various causes of action under the ADEA and ERISA. Among the claims alleged were the four now before us: (1) whether the relatively longer

-5-

wear-away periods for many older El Paso employees violated § 4 of the ADEA, 29 U.S.C. § 623, ("ADEA claim"); (2) whether the wear-away periods violated ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1), ("anti-backloading claim"); (3) whether El Paso gave inadequate notice of plan changes in violation of ERISA § 204(h), 29 U.S.C. § 1054(h), ("notice claim"); and (4) whether El Paso's SPD failed to comply with ERISA § 102, 29 U.S.C. § 1022, and its implementing regulations ("SPD claim").[4]

The district court dismissed the anti-backloading and notice claims under Fed. R. Civ. P. 12(c) for failure to state a claim. It later granted El Paso's motion for summary judgment, dismissing the SPD claim on the merits and the ADEA claim as untimely. However, the court subsequently granted plaintiffs' motion to alter or amend judgment, reviving the ADEA claim based on the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2, 123 Stat. 5. Plaintiffs' success on that score was short-lived, however. The ADEA claim was soon dismissed again, this time on the merits. Plaintiffs timely appealed the dismissal of the four claims listed above.

**II**

Two of plaintiffs' claims were dismissed pursuant to Rule 12(c), and two were dismissed at summary judgment. "We review a dismissal granted under Rule 12(c) under the standard of review applicable to a Rule 12(b)(6) motion to dismiss." Nelson v. State Farm Mut. Auto Ins. Co., 419 F.3d 1117, 1119 (10th Cir. 2005) (quotation omitted). Under that standard, we review the motion de novo, accepting factual allegations as true

---

[4] Another claim asserted by plaintiffs below is not at issue in this appeal.

and considering them in the light most favorable to the plaintiff.  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).

We review a grant of summary judgment de novo, applying the same legal standard as the district court.  Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).  Summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The evidence should be viewed in the light most favorable to the non-moving party.  Simms, 165 F.3d at 1326.

## III

### A

Plaintiffs argue that El Paso "designed its transition to produce extremely lengthy periods of 'wear-away'" in violation of ADEA § 4, 29 U.S.C. § 623.  As an initial matter, we must decide whether plaintiffs' ADEA claim should be considered under ADEA § 4(a) or § 4(i).  Section 4(a) broadly prohibits age discrimination against an employee with respect to "compensation, terms, conditions, or privileges of employment."  29 U.S.C. § 623(a).  Section 4(i) provides:

> Except as otherwise provided in this subsection, it shall be unlawful for an employer . . . to establish or maintain an employee pension benefit plan which requires or permits—
> (A) in the case of a defined benefit plan, the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age . . . .

29 U.S.C. § 623(i)(1). It continues: "[c]ompliance with the requirements of this subsection with respect to an employee pension benefit plan shall constitute compliance with the requirements of this section relating to benefit accrual under such plan." § 623(i)(4).

We conclude that plaintiffs' ADEA claim "relat[es] to benefit accrual," id., and thus falls within the ambit of ADEA § 4(i). A claim regarding allegedly discriminatory wear-away periods fits comfortably within the term "benefit accrual." That phrase is not defined by statute, but in common usage it refers to the increase in benefits over a given period of time. See Black's Law Dictionary 20 (6th ed. 1990) (defining "accrue" as "to increase"); see also Hurlic v. S. Cal. Gas Co., 539 F.3d 1024, 1030 (9th Cir. 2008) ("The phrase 'rate of an employee's benefit accrual' plainly refers to the rate at which a participant's benefits increase . . . .").

Plaintiffs even seem to concede that their claims concern benefit accrual. They argue that wear-away periods constitute "cessation of an employee's benefit accrual" and therefore violate the plain language of § 4(i). And they complain that, for some employees, "'wear-away' periods would last over 10 years before benefit accruals would resume." As the Ninth Circuit stated, these claims "relate[] to benefit accrual because [they] challenge[] the fact that benefits do not increase for some period of time." We agree and conclude that plaintiffs' ADEA claim is governed by § 4(i).[5]

---

[5] El Paso suggests that, because plaintiffs pled their ADEA claim under § 4(a), they may not now argue that El Paso violated § 4(i). However, we decline to treat the relationship between the two provisions as a "gotcha" pleading requirement. Plaintiffs'

-8-

**B**

Having determined that §4(i) controls our analysis, we turn to the primary issue on appeal: whether the relatively lengthy wear-away periods for older workers constitute age discrimination. Plaintiffs argue that, even though younger employees receive the same pay and interest credits as older employees,[6] older employees are more likely to experience wear-away periods and those periods tend to have a longer duration. El Paso counters that the measure of compliance under § 4(i) is whether an employer discriminates with respect to <u>inputs</u>, not <u>outputs</u>.[7] In other words, El Paso claims that the ADEA is satisfied as long as an employer treats older and younger employees equally with respect to credits to their cash balance accounts, even if such treatment results in longer wear-aways for older employees.

El Paso points to the reasoning of the Seventh Circuit. In <u>Cooper</u>, the court considered whether a pension plan violated an ERISA anti-age discrimination provision that tracks the language of ADEA § 4(i). <u>See</u> <u>Hurlic</u>, 539 F.3d at 1036 ("ADEA § 4(i)(1)(A), mirrors ERISA § 204(b)(1)(H)(i) . . . ."). Like El Paso's plan, the cash

pleadings placed El Paso on notice that they were making an accrual-related claim under § 4. This satisfies the liberal pleading standard of Fed. R. Civ. P. 8(a).

[6] Older employees actually receive larger pay credits, in part because the percentage of pay credited to employees' cash balance accounts increases with age plus years of service.

[7] The terms "inputs" and "outputs" are widely used in the ERISA context. We use the terms in the same manner they were used by the Seventh and Third Circuits. <u>See</u> <u>Cooper v. IBM Pers. Pension Plan</u>, 457 F.3d 636, 638-39 (7th Cir. 2006); <u>Register v. PNC Fin. Servs. Grp., Inc.</u>, 477 F.3d 56, 69 (3d Cir. 2007). "Input" refers to what an employer credits to an employee's account—whether in dollars or hypothetical credits. "Output" refers to the annuity an employee would receive if he retired at age 65.

-9-

balance plan at issue in <u>Cooper</u> used a combination of pay and interest credits to fund hypothetical employee accounts. <u>See</u> 457 F.3d at 638-39. And because younger employees had more time before retirement to accrue interest credits, the plan in <u>Cooper</u> resulted in younger employees receiving larger "accrued benefits," <u>id.</u>; that is, larger retirement benefits "expressed in the form of an annual benefit commencing at normal retirement age." <u>See</u> 29 U.S.C. § 1002(23)(A) (defining "accrued benefit" for defined-benefit plans). Acknowledging the time value of money, the court rejected the notion that such a plan is discriminatory:

> The phrase "benefit accrual" reads most naturally as a reference to what the employer puts in (either in absolute terms or as a rate of change), while the defined phrase "accrued benefit" refers to outputs after compounding. That's where this litigation went off the rails: a phrase dealing with inputs was misunderstood to refer to outputs.

<u>Cooper</u>, 457 F.3d at 639.

<u>Cooper</u>'s logic is inescapable. "Treating the time value of money as a form of discrimination is not sensible." <u>Id.</u> An employee does not receive less valuable interest credits as he ages, but in projecting an annuity payable at age 65, the simple fact that younger employees have more time to accrue interest leads to larger "accrued benefits" for younger employees. "Nothing in the language or background of [ERISA] suggests that Congress set out to legislate against the fact that younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings." <u>Id.</u>

If measured solely by the accrued benefit, every facially age-neutral plan that relies on interest credits would amount to age discrimination. Yet § 4(i) does not use the

defined term "accrued benefit," referring instead to "benefit accrual." Based on this choice of language, every circuit that has considered the issue has reached the same conclusion as Cooper and held that a meritorious claim under ADEA § 4(i) or its ERISA counterpart must be based on discriminatory inputs rather than outputs. See Hurlic, 539 F.3d at 1032; Drutis v. Rand McNally & Co., 499 F.3d 608, 612 (6th Cir. 2007); Register, 477 F.3d at 68-69.

We join those circuits in holding that plaintiffs alleging discriminatory benefit accrual must present evidence showing that the inputs are discriminatory rather than relying on disparate outputs. Further, we agree with the Third and Seventh Circuits that cash balance plan credits are the relevant "input." See Register, 477 F.3d at 68; Cooper, 457 F.3d at 639. Comparing the analogous statutory provisions covering defined-benefit plans and those covering defined-contribution plans, the Cooper opinion explained:

> As long as we think of "benefit accrual" as referring to what the employer imputes to the account . . . there is no statutory difference between the treatment of economically equivalent defined-benefit and defined-contribution plans. For defined-benefit plans, where the account is an accounting entry rather than cash, "benefit accrual" matches the money "allocated" to a defined-contribution plan.

Cooper, 457 F.3d at 639; see also Register, 477 F.3d at 68 ("[T]he 'benefit' as used in the phrase 'benefit accrual' refers to the stated account balance as that is how the benefit is defined by cash balance plans.").

This holding dooms plaintiffs' ADEA claim because they did not proffer any evidence suggesting that El Paso's inputs—the pay and interest credits—were distributed in a discriminatory manner. The only input that varies with age, the pay credit, actually

-11-

increases as an employee gets older.  Plaintiffs submitted an expert report purporting to

show that for two otherwise identical employees, one age 30 and one age 55, the older

employee would experience a longer wear-away period.  But that calculation rests on

comparative outputs, not inputs.  The wear-away periods at issue are determined by the

relative values of the accrued benefit under El Paso's old plan (subject to the freeze at the

end of the transition period) and the accrued benefit under El Paso's cash balance plan.  It

is not caused by discriminatory inputs.

Considering substantially the same expert testimony—from the same expert no

less—a district court recently noted that a "wear-away period is neither an input nor an

output, but a higher-level construct derived from output functions of the Plan."  See

Engers v. AT&T, Inc., No. 98-3660, 2010 U.S. Dist. LEXIS 56881, at *12 (D.N.J. June

7, 2010) (unpublished).  That court further concluded that the expert analyses regarding

wear-away periods were "not relevant evidence of benefit accrual, within the meaning of

29 U.S.C. § 623(i)(1)(A)."  Engers, 2010 U.S. Dist. LEXIS 56881, at *12.  We agree.  As

long as younger and older employees receive credits to their accounts in a non-

discriminatory manner, the plan complies with § 4(i).  See Hurlic, 539 F.3d at 1037

("[T]he wear-away provision is not prohibited by ADEA § 4.").

Plaintiffs argue that we should ignore the pay and interest credits because

employees in the midst of a wear-away period do not actually earn any inputs under the

cash balance plan.  A participant will receive the frozen accrued benefit under the old

plan only if it is greater than the value of the participant's cash balance account.  But we

will not hold that an otherwise permissible plan discriminates against older employees

merely because older employees are more likely to qualify for a greater benefit. The wear-away periods are caused in large part by the fact that El Paso allowed employees to continue to accrue benefits under the old plan as well as the cash balance plan during the transition period. As described in a 1996 letter to employees, the purpose of the transition period was to allow "employees within five years of retirement . . . to receive a pension benefit equal to what they would receive under the current plan formula."

This transition structure does not render the cash balance credits illusory. Employees in a wear away period accrue pay and interest credits in their hypothetical accounts; those benefits are simply displaced by a larger benefit available under the old plan. El Paso was not required to provide that greater benefit. We agree with the Hurlic court that it "would be an odd result indeed to allow a pension plan which converts to a cash balance formula to freeze pre-conversion benefits immediately but forbid a plan from providing for a grace period in which participants can continue to accrue additional benefits before they are frozen." 539 F.3d at 1035. And although we recognize that the old plan provided greater benefits to older workers, our task is not to determine the relative values of the old and new plans, but to determine whether the new plan discriminates on the basis of age. "[R]emoving a feature that gave extra benefits to the old differs from discriminating against them. Replacing a plan that discriminates against the young with one that is age-neutral does not discriminate against the old." Cooper, 457 F.3d at 642.

Because plaintiffs have not presented evidence regarding plan inputs suggesting that El Paso ceased or reduced "the rate of an employee's benefit accrual, because of age," 29 U.S.C. § 623(i)(1), their claim necessarily fails under ADEA § 4(i).

## C

Plaintiffs argue that, if we conclude their claim is not cognizable under ADEA § 4(i), they should be permitted to proceed under § 4(a). If their claim is concerned with the "accrued benefit" rather than "benefit accrual," they contend, it would fall outside the ambit of § 4(i) but within the broader prohibition against age discrimination contained in § 4(a). But this does not necessarily follow. Plaintiffs have stated a claim that relates to benefit accrual, but have improperly attempted to prove that claim by presenting evidence focused on accrued benefits.

In any event, our circuit precedent forecloses the approach advocated by plaintiffs. In Jensen v. Solvay Chemicals, Inc., 625 F.3d 641 (10th Cir. 2010), we considered the interaction between subsections (a) and (i), and held that "compliance with § 4(i) satisfies § 4, period." Jensen, 625 F.3d at 660. The Third Circuit recently reached the same conclusion. See Engers v. AT&T, Inc., No. 10-2752, 2011 U.S. App. LEXIS 12675, at *6-8 & n.6  (3d Cir. Jun. 22, 2011) (unpublished) ("[C]ompliance with ADEA § 4(i) [is] a complete defense to [plaintiffs'] ADEA claims . . . .").

Our holding in Jensen was based on the plain text of the statute. The ADEA provides that "[c]ompliance with the requirements of this subsection [ADEA § 4(i)] with respect to an employee pension benefit plan shall constitute compliance with the requirements of this section relating to benefit accrual under such plan." 29 U.S.C.

-14-

§ 623(i)(4). And, as we noted in <u>Jensen</u>, our construction is confirmed by the legislative history of ADEA § 4(i). A conference report for the amendment adding § 4(i) states that "the requirements contained in section 4(i) related to an employee's right to benefit accruals with respect to an employee benefit plan . . . shall constitute the entire extent to which ADEA affects such benefit accrual and contribution matters with respect to such plans . . . ." <u>Jensen</u>, 625 F.3d at 659-60 (quoting H.R. Rep. No. 99-1012, at 144 (1986) (Conf. Rep.), <u>reprinted in</u> 1986 U.S.C.C.A.N. 3868, 4027).

Plaintiffs characterize this reading of the statute as creating a loophole in the ADEA, but this is not so. Rather than creating a loophole, our interpretation respects Congress' intent that age discrimination in cash balance pension plans be measured by inputs. Because plaintiffs did not present evidence showing that El Paso's plan uses discriminatory inputs, the district court properly granted summary judgment in favor of El Paso on the ADEA claim.

## IV

Plaintiffs also contend that the El Paso plan violates the anti-backloading provision of ERISA, 29 U.S.C. § 1054(b)(1). This subsection prevents employers from "backloading" pension benefits by structuring plans under which an employee would accrue the bulk of his benefits when he is close to retirement.

> Congress intended by the anti-backloading provision to prohibit an employer from "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and . . . concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement."

-15-

Register, 477 F.3d at 71 (quoting H.R. Rep. No. 93-807, at 4688 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4688).

Under 29 U.S.C. § 1054(b)(1), a pension benefit plan must satisfy one of three anti-backloading tests. El Paso concedes that its plan must qualify under the "133 1/3 percent" test if it qualifies at all. This test mandates that that the amount a participant accrues in any given year "is not more than 133 1/3 percent of the annual rate at which he" accrued benefits in the previous year. § 1054(b)(1)(B); see Register, 477 F.3d at 71.

Plaintiffs argue that the El Paso plan does not satisfy the 133 1/3 percent test because participants in a wear-away period experience zero accrual during the wear-away, then experience years of positive accrual when the wear-away ends. Any positive accrual is more than 133 1/3 percent larger than zero.

But the statute further provides that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." § 1054(b)(1)(B)(i). We agree with the Third Circuit's conclusion in Register that this language means "once there is an amendment to the prior plan, only the new plan formula is relevant when ascertaining if the plan satisfies the 133 1/3 [percent] test. A participant's election to retain his [benefits under] the old plan is not relevant to this calculation." 477 F.3d at 72.

Plaintiffs point to a Treasury Department regulation and a Revenue Ruling to support their position. The pertinent regulation provides that, if "the accrued benefits for participants are determined under more than one plan formula," we look to the aggregate "accrued benefit" under both formulas. See 26 C.F.R. § 1.411(b)-1(a). In Revenue

-16-

Ruling 2008-7, the Treasury Department concluded that a cash balance transition very similar to El Paso's would violate the 133 1/3 percent rule and Treasury Regulation § 1.411(b)-1(a) as to employees experiencing a wear-away. See 2008 IRB LEXIS 78, at *30-33 (Feb. 1, 2008).

The Ninth Circuit has rejected the reasoning of Revenue Ruling 2008-7. Hurlic, 539 F.3d at 1035. It noted that the likely consequence of applying the Ruling would be to dissuade plans from offering a transition period altogether, which would be worse for most participants. Id. We agree that Revenue Ruling 2008-7 is unpersuasive. The anti-backloading provision is intended to prohibit employers from concentrating benefit accruals in the final years before an employee retires. See Register, 477 F.3d at 71. The wear-away periods at issue, however, are caused by employees accruing greater benefits during the transition period under the old plan followed by lesser benefits under the new plan. Under El Paso's transition, benefit accruals are frontloaded, not backloaded.

Plaintiffs contend that we must afford the ruling controlling deference because it constitutes an interpretation of a regulation written by the agency itself. An "agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulations being interpreted." Long Island Health Care at Home, Ltd. v. Coke, 551 U.S. 158, 171 (2007) (quotations omitted).[8] El Paso argues that Revenue Rulings are

---

[8] This type of deference is distinct from deference due agency interpretations of statutes under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See Auer v. Robbins, 519 U. S. 452, 461-63 (1997). "Auer deference" has been criticized as creating serious separation of powers concerns, see Talk Am. Inc. v. Mich. Bell Tel. Co., 131 S. Ct. 2254, 2265-66 (2011) (Scalia, J., concurring), but it remains good law.

subject to deference only to the extent they are persuasive.  See IHC Health Plans, Inc. v. Comm'r, 325 F.3d 1188, 1194 n.11 (10th Cir. 2003) ("Although we are not bound by IRS regulations or revenue rulings, we do accord them deference."); see also Hurlic, 538 F.3d at 1034 (affording only light deference to Revenue ruling 2008-7 under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

The district court below, and the Hurlic opinion, appear to have considered Revenue Ruling 2008-7 solely in terms of its interpretation of ERISA, rather than as an interpretation of Treasury Regulation § 1.411(b)-1(a).  However, the ruling plainly considered whether a pension plan violated either the statute or the regulation.  See Rev. Rul. 2008-7, 2008 IRB LEXIS 78, at *37.  The level of deference due to a Revenue Ruling under these circumstances is not entirely clear.

However difficult this issue might be, we need not reach it.  Revenue Ruling 2008-7 explicitly does not apply to "moratorium plans," as defined by Notice 2007-6, which include El Paso's plan.  2008 IRB LEXIS 78, at *46.  The ruling states that "for plan years beginning before January 1, 2009, the Service will not treat a plan described in the preceding sentence [those like El Paso's ] as failing to satisfy the accrual rules."  Id.  This treatment mirrors that of proposed Treasury Regulations which would allow the calculation of accrual under a "greater-of" plan separately, under each formula, to determine if the plan complies with the 133 1/3 percent rule.  Accrual Rules for Defined-benefit Plans, 73 Fed. Reg. 34,665, 34,668 (June 18, 2008).

Plaintiffs contend that the Revenue Ruling's exception should not influence our decision because it is based on the Treasury Department's authority to decline to apply an

-18-

agency rule retroactively.  See 26 U.S.C. § 7805(h); Rev. Rul. 2008-7, 2008 IRB LEXIS 78, at *45-48.  But plaintiffs may not pick and choose which portions of the Revenue Ruling should be credited; the scope of our deference to an agency's interpretation of its own regulations is, absent Congressional intent to the contrary, coterminous with the scope the agency intends.  Cf. Long Island Health Care at Home, Ltd., 551 U.S. at 172 ("[T]he Department intended the . . . regulation as a binding application of its rulemaking authority.").  Revenue Ruling 2008-7 does not apply to El Paso's plan by its own terms, and, assuming arguendo that Auer deference is appropriate in this case, we will not expand the rule to invalidate El Paso's plan.

Thus, like the third Circuit in Register, we conclude that for a plan amendment featuring a "greater of" transition period, "[a] participant's election to retain his [benefits under] the old plan is not relevant to this calculation."  477 F.3d at 72.  Instead, we look to whether the new plan formula would violate the 133 1/3 percent test if it had been in effect for all years.  29 U.S.C. § 1054(b)(1)(B)(i).  And because plaintiffs do not argue that the new plan fails under this reading, the anti-backloading claim was properly dismissed.

**V**

Plaintiffs complain that El Paso did not provide the notice required by ERISA § 204(h), 29 U.S.C. § 1054(h).  The version of the statute applicable in 1997, when El Paso's new plan took effect,[9] stated that a plan

---

[9] Plaintiffs argue that amendments adopted in 2001 should apply to El Paso's plan. In 2001, Congress amended ERISA's notice requirements in the Economic Growth and

may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date . . . .

29 U.S.C. § 1054(h)(1) (version in effect on January 1, 1997). Implementing regulations in effect at the time of El Paso's amendment did not require an employer to "explain how the individual benefit of each participant . . . will be affected by the amendment." 26 C.F.R § 1.411(d)-6T, A-10 (1996). However, they did require employers to include either the plan amendment or a summary of the plan amendment "written in a manner calculated to be understood by the average plan participant." Id. at A-10.

Our only opinion considering notification of wear-away periods is Jensen, which considered the adequacy of notice governed by the more recent version of the statute. 625 F.3d at 651. The 2001 Amendments to ERISA and implementing regulations require a much more detailed and individualized assessment of the effects of plan changes. Id.; see 29 U.S.C. § 1054(h)(2); 26 C.F.R. § 54.4980F-1. The newer regulations lay out specific requirements for transitions from a defined-benefit plan to a cash balance plan, and mandate that the company give a range of examples illustrating the effects of the new plan. Jensen, 625 F.3d at 655-56 (citing 26 C.F.R. § 54.4980F-1, A-11(a)(4)(ii)(A)-(B)).

Tax Relief Reconciliation Act of 2001, Pub. L. 107-16, § 659, 115 Stat. 38, 137-41 (the "2001 Amendments"). The changes to ERISA § 204(h) apply to plan amendments taking effect on or after June 7, 2001. Plaintiffs posit that the El Paso plan did not really "take effect" until the end of the transition period, in December 2001. However, the effective date of the amendment, as stated in the October 1996 letter, was January 1, 1997. And we cannot ignore the fact that employees began accruing benefits under the cash balance formula at the beginning of the transition period. We agree with the district court that the El Paso plan amendments took effect on January 1, 1997.

In light of these detailed regulations, we concluded wear-away periods did not need to be explicitly disclosed provided that the employer's notice gave sufficient representative examples of the effects of the plan amendment. Id. at 656.

El Paso argues that, because we reached this conclusion "even under . . . more stringent requirements," we must reject plaintiffs' claim under the prior regulations. But Jensen does not control our analysis. The "more stringent" 2001 regulations include an example of the precise notifications that satisfy the 2001 Amendments. 26 C.F.R. § 54.4980F-1, A-11(b). It was entirely reasonable for the defendant in Jensen to assume that if it followed the letter of the regulations, it would comply with ERISA. In contrast, the regulation under which we must conduct our analysis is far less detailed. Compare 26 C.F.R § 1.411(d)-6T (1996) with 26 C.F.R. § 54.4980F-1, A-11(a)(4)(ii)(A)-(B). It does not follow that because wear-aways need not be disclosed under the new regulations, they also did not need to be disclosed under the old.

Two of our sister circuits have considered whether wear-away periods needed to be disclosed under the old regulations. In Register, the Third Circuit determined that notice requirements were minimal. 477 F.3d at 73. There, participants were provided with a notification that explained the design of the new cash balance plan, instructed participants how to interpret their pension statements, and warned explicitly that the cash balance plan "in some instances may reduce the rate of future Pension Plan benefit accruals." Id. at 72-73. The court rejected plaintiffs' argument that the company was required to go further and state that each plan participant would see reduced accrual. Id. at 73. Determining that such forthrightness was not required by the regulations, the court

concluded "[t]he brochure set forth the plan amendment and the effective date. That explanation was all that was required." Id.

In contrast, the Ninth Circuit, in Hurlic, determined that notification of wear-away periods was required. 539 F.3d at 1038. Although the defendant company conceded that it had not issued any notice, it argued that plaintiffs did not suffer any harm and were therefore not entitled to be notified of benefit reductions. Id. The court rejected this contention, concluding that the plaintiffs

> were entitled to receive notice of the wear-away provision. Even without an individualized explanation of how the provision would affect their benefits, notice of the provision could have induced Plaintiffs to increase savings in other retirement vehicles or to consider other employment.

Id.

We conclude that El Paso's October 1996 letter and brochure provided all the notice required by ERISA § 204(h). Two months before the plan's adoption,[10] El Paso circulated a letter regarding the upcoming plan change. It contained the effective date of the new plan. It warned plan participants that the new plan would be less generous than the old. It told employees that "the current pension plan formula will be frozen for

___

[10] Plaintiffs argue that we may not consider the letter because it was circulated before the adoption of the plan. Yet they fail to explain how receiving notice slightly beforehand harmed them. Absent some showing of harm, we decline to invalidate a plan based on such a de minimis technicality. The Seventh Circuit's suggestion to the contrary notwithstanding, we fail to discern any basis for such invalidation in either the statutory language or its overarching purpose, which favors early notice. See Prod. & Maint. Emps' Local 504 v. Roadmaster Corp., 954 F.2d 1397, 1403 (7th Cir. 1992) (holding that a § 204(h) notice failed to comply for numerous reasons, including that it was posted prior to adoption). As we discuss in greater detail in PartVI, infra, the Supreme Court recently altered the required showing of prejudice for some ERISA claims, but even under this new, more lenient standard, "actual harm must be shown." Cigna Corp. v. Amara, 131 S. Ct. 1866, 1882 (2011).

[some] participants and they will not earn any additional benefits under the current plan." The brochure went further and explained the calculation of benefits and the transition period. Knowing that their minimum benefit would freeze and knowing that they would have a choice between the minimum benefit and the more slowly-growing cash account benefit, employees were effectively on notice of the wear-away.

The Ninth Circuit's reasoning in Hurlic is not to the contrary. Hurlic merely held that in the complete absence of timely notice, failure to summarize a plan amendment could have harmed plaintiffs by preventing them from understanding the possibility of a wear-away period. 539 F.3d at 1038. In Hurlic, plaintiffs had no way of knowing that wear-away periods might occur because the company's notice included no summary of the plan amendment. Id. In this case, plaintiffs were explicitly warned that their benefits under the old plan would likely be "frozen," and that they would receive the greater of the frozen minimum benefit or the new cash balance benefit. The brochure summarizing the plan, combined with the earlier letter which was quite direct about the potential downsides of the transition, provided adequate notice under ERISA § 204(h).[11]

---

[11] Plaintiffs also argue that the letter and brochure could not constitute § 204(h) notice because they were not labeled as such, whereas later notifications were labeled as compliant with the statute. They cite no authority supporting this position.

Plaintiffs further point to their communication expert's report, which concludes that the positive language in the brochure was confusing and led employees to believe that they were all "winners" under the cash balance plan. This report was not presented to the district court until after its ruling on El Paso's motion for judgment on the pleadings. As such, we will not consider it for the purposes of the notice claim, but will with respect to claims dismissed after the report's submission.

**VI**

Lastly, plaintiffs argue the 2002 SPD issued by El Paso was inadequate because it did not include information regarding "wear-away periods and benefit reductions." El Paso counters, and the district court concluded, that plaintiffs were not prejudiced by the SPD because they did not rely on it in any meaningful way as required by Chiles v. Ceridian Corp., 95 F.3d 1505, 1519 (10th Cir. 1996), and because they received the information from other sources. Alternatively, the company contends, ERISA § 102, 29 U.S.C. § 1022, does not require disclosure of the information forming the basis of plaintiffs' SPD claim.

**A**

In Chiles, we held that plaintiffs must "show some significant reliance upon, or possible prejudice flowing from, the faulty plan description." 95 F.3d at 1519. Other circuit courts applying such a rule have suggested that plaintiffs must read the document to demonstrate prejudice from an inadequate SPD. See Mauser v. Raytheon Co. Pension Plan for Salaried Emps., 239 F.3d 51, 55 (1st Cir. 1991) (noting but declining to reach the issue); Branch v. G. Bernd Co., 955 F.2d 1574, 1579 (11th Cir. 1992). The district court below reached a similar conclusion, stating:

> Plaintiffs assert that it is not established that Plaintiffs ever received the SPD and contend that Plaintiffs could have heard about the contents of the SPD from other employees. Plaintiffs miss the point. Regardless of the reason, if Plaintiffs did not ever read the SPD, they cannot have been injured by any reliance upon allegedly inadequate information contained therein.[12]

---

[12] Plaintiffs point to Tomlinson's deposition in which he states that he <u>did</u> consult the SPD for certain limited purposes.

(Footnote omitted.)

The Supreme Court recently rejected <u>Chiles</u>' reliance requirement. In <u>Amara</u>, the Court emphasized that the need to show reliance depends on the remedy sought. 131 S. Ct. at 1881. A reliance requirement arises only "because the specific remedy being contemplated imposes such a requirement." <u>Id.</u> In some instances, for example, when plaintiffs are seeking an estoppel remedy, it may be necessary to prove detrimental reliance. <u>Id.</u> However, "this showing is not always necessary for other equitable remedies." <u>Id.</u> Even when a showing of reliance is required, reliance need not turn on reading the SPD. For example, if the claim stems from

> the loss of a right protected by ERISA . . . it is not difficult to imagine how the failure to provide proper summary information . . . injured employees if they did not themselves act in reliance on summary documents—which they might not themselves have seen—for they may have thought fellow employees, or informal workplace discussion, would have let them know if, say, plan changes would likely prove harmful. We doubt that Congress would have wanted to bar those employees from relief.

<u>Id.</u>

Thus, for the injunctive relief sought by the plaintiffs, it would be sufficient to show harm caused by El Paso's breach of ERISA § 102, 29 U.S.C. § 1022. "Although it is not always necessary to meet the more rigorous standard implicit in the words 'detrimental reliance,' actual harm must be shown." <u>Amara</u>, 131 S. Ct. at 1881-82.

**B**

Although the district court's rationale cannot be affirmed following <u>Amara</u>, plaintiffs' SPD claim suffers from a more fundamental problem—under our precedent it

is clear that wear-aways need not be explicitly disclosed in the SPD.  See Jensen, 625 F.3d at 658.  The implementing regulations for ERISA § 102, 29 U.S.C. § 1022, require employers to identify in the SPD any "circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery (e.g., by exercise of subrogation or reimbursement rights) of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide."  29 C.F.R. § 2520.102-3(*l*).  The regulations further provide that an SPD must not be "misleading" and should not "minimize[ or] render[] obscure" other restrictions on benefits.  29 C.F.R. § 2520.102-2(b).

Relying on Jensen, El Paso contends that there was no requirement to include information regarding wear-away periods in the SPD.  See 625 F.3d at 658.  We agree with this reading of Jensen.  In that case, we considered the failure of a company to include in its SPD any information regarding the wear-away of early retirement benefits.  Id. at 657.  We rejected the suggestion that wear-away periods are tantamount to eligibility requirements that would have to be disclosed in the SPD.  Id. at 658.  Instead, we concluded that a wear-away period is a "consequence of the change in plan terms" that "need not be disclosed as a new eligibility requirement."  Id.  Absent a finding of deceit on the part of the employer or a failure on the part of the employer to explain how benefits are calculated, we will not invalidate an SPD that neglects to inform employees of a wear-away period.  See id. at 658.

Plaintiffs have presented evidence through their communications expert that the SPD and surrounding notices were somewhat confusing.  But they do not provide any

evidence supporting an inference that the SPD was deceitful, contra Amara v. CIGNA Corp., 534 F. Supp. 2d 288, 340, 346 (D. Conn. 2008), vacated on other grounds 131 S. Ct. 1866, or failed to explain the manner of conversion to cash balance accounts, contra Richards v. FleetBoston Fin. Corp., No. 3:04-cv-1638, 2006 WL 2092086, at *8 (D. Conn. July 24, 2006). Thus, we are bound by our prior conclusion that wear-away periods "need not be disclosed" explicitly in the SPD. Jensen, 625 F.3d 658.[13]

**VII**

For the foregoing reasons, we **AFFIRM**. We **GRANT** plaintiffs' motion to strike footnote 3 of El Paso's brief and pages 16-17 of the Supplemental Appendix. See Am. Stores Co. v. Comm'r, 170 F.3d 1267, 1270 (10th Cir. 1999) (private IRS rulings and memoranda are not properly subject to judicial notice).

---

[13] Plaintiffs argue that additional evidence may have been uncovered if the district court had not abused its discretion in denying their Fed. R. Civ. P. 56(f) motion. See Garcia v. United States Air Force, 533 F.3d 1170, 1179 (10th Cir. 2008) (such motions are reviewed for abuse of discretion). However, given our conclusion that wear-away periods need not be specifically disclosed, and the fact that the SPD is included in the record, we conclude that the district court did not abuse its discretion. Additional evidence would not change Jensen's holding or the language of the SPD.